## GOLDBERG et al. v. TRI-STATES THEATRE CORPORATION.

### No. 12066.

Circuit Court of Appeals, Eighth Circuit.

March 3, 1942.

the lease upon the World Theatre property to 'Premier Theatres' shall remain in effect."

Premier, which was a mere subsidiary of plaintiff, had assigned its contract of sublease on the World Theatre to plaintiff, and it is not disputed here that plaintiff is entitled to assert such general rights as Premier itself would have had under the sublease clause quoted.

World Realty held 99 year leases upon both the World and State Theatre buildings, from the fee owners. At the time it made the ten year sublease on the World Theatre to Premier, defendant Goldberg was the managing officer and a director of World Realty, and he executed the contract on behalf of the corporation. The stock of the corporation was all held by Goldberg's mother, father and himself, except twenty-four per cent which had been assigned to the Omaha National Bank as collateral for a loan. Goldberg and one of the officers of the bank, who was looking after its interests under the loan, constituted the sole directors of the corporation. Immediately after the contract of sublease had been made between World Realty and Premier, Goldberg set out to acquire title to the State Theatre Building from the fee owners. He organized defendant State Investment Corporation for this express purpose, and admitted that he at all times had been "the owner of substantially all of the stock" and "in complete control" of that corporation.

After title to two-thirds of the State Theatre property had thus been acquired in the name of State Investment, Goldberg claims that an agreement was made between himself, on behalf of State Investment, and himself and the officer of the Omaha National Bank, on behalf of World Realty, for a cancellation of the latter's 99 year lease on the State Theatre. Shortly thereafter the bank's loan appears to have been paid off, and the stock held by it was cancelled and retired. The connection of the bank and its officer with World Realty thereupon ceased, and, so far as the record indicates, from that time on, Goldberg was the sole officer and director of the corporation, with his mother, his father and himself as the sole stockholders, and with himself as the sole representative of the entire stock interests.

I. J. Dunn and John C. Mullen, both of Omaha, Neb. (I. Ziegler and George W. Becker, both of Omaha, Neb., on the brief), for appellants.

Yale C. Holland, of Omaha, Neb. (J. A. C. Kennedy and Eugene N. Blazer, both of Omaha, Neb., on the brief), for appellee.

Before STONE, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

This is a suit to enjoin the use for theatre purposes, by defendants, of the State Theatre Building, located at 1410–1414 Farnam Street, in the city of Omaha, Nebraska.[1] The injunction was sought under a contract of sublease upon the World Theatre Building, located at 15th and Douglas Streets, Omaha, between defendant World Realty Company and Premier Theatres Corporation, for the period from October 1, 1934, to September 30, 1944, which contained the following clause: " 'World Realty' agrees that it will not use the State Theatre Building * * *, nor will it suffer or permit the State Theatre Building to be used for the purpose of operating a theatre as long as

---

[1] Jurisdiction rests upon diversity of citizenship, plaintiff being a Delaware corporation and defendants all being residents of Nebraska.

After title to the other one-third of the State Theatre property had subsequently been acquired, Goldberg purported to make arrangements between himself, on behalf of State Investment, as lessor, and himself, on behalf of defendant A. L. Kaplan, Inc., another corporation, in which he was the sole stockholder, as lessee, to re-open the State Theatre, with himself as manager. Plaintiff sought to enjoin the reopening, as a violation of the restrictive clause in its contract of sublease on the World Theatre.

The District Court granted an injunction against all the defendants who have been referred to herein, as prayed, and they have appealed.

■ Appellants rigorously assail the finding of the trial court that the evidence was insufficient to show a valid cancellation of the 99 year lease of World Realty on the State Theatre, which could furnish the necessary foundation for unconditional rights, under an independent tenancy, in favor of a third party, such as A. L. Kaplan, Inc. was claimed to be. The only testimony upon the question of cancellation was that of Goldberg himself, who frankly admitted that there were no minutes of the board of directors or other corporate records on the part of either World Realty or State Investment to corroborate his statements. Nor was there any showing that a formal release or quitclaim of the 99 year lease ever had been executed by World Realty or filed of record.

Goldberg merely testified, in response to a question as to what arrangements had been made between State Investment and World Realty with relation to the payment of further rent and the possession of the property, as follows: "The State Investment Company agreed not to charge the World Realty Company any rent for the ground in the future. In other words, so far as the State Investment Corporation was concerned, the State Investment Corporation agreed to remove the burden of the ground rent." Further, in response to a direct and leading question as to whether the lease actually was cancelled, he declared: "The State Investment Corporation actually cancelled the lease, and has, since its purchase of the property, kept the World Realty Company harmless from any further expense." The only other fact to which Goldberg testified in this connection was that World Realty thereupon "agreed to abandon the building", and that it did accordingly surrender possession to State Investment.

If Goldberg's testimony should be accepted as sufficient to show that World Realty and State Investment actually agreed upon a cancellation of the 99 year lease, as appellants contend that it ought, it is clear that it at most establishes a cancellation based upon a voluntary surrender, and not one grounded on a forfeiture right. There is no evidence that any default existed under the 99 year lease at the time. The only thing that Goldberg's testimony indicates that was involved was an agreement "not to charge the World Realty Company any rent for the ground in the future".

■ While no Nebraska decision has been found upon the proposition, it is a well settled rule in equity that a surrender by a lessee, where no right of forfeiture has accrued, will not ordinarily be allowed to defeat the interests or equities of third persons in the term.[2] As against such interests or equities, an acquisition of the term, based on mere surrender, does not leave the lessor in any better position than a regular assignee. Where a lessee has made an agreement with a third person, validly restricting the use of the property during the term, the restriction is enforcible in equity against an assignee with notice or any one in an equivalent position.[3] If it appears that the assignment was made for the express purpose, on the part of both the assignor and assignee, of defeating or evading the interest or equity of a third person in the term, there clearly should be no hesitancy in enforcing the restrictive agreement. In fact, in any case, as against an assignee with notice or any

[2] See Firth v. Rowe, 53 N.J.Eq. 520, 32 A. 1064; Hessel v. Johnson, 129 Pa. 173, 18 A. 754, 5 L.R.A. 851, 15 Am.St. Rep. 716; Buttner v. Kasser, 19 Cal. App. 755, 127 P. 811, 813; Ouschner v. Westlake, 43 Wash. 690, 86 P. 948, 950; Mitchell v. Young, 80 Ark. 441, 97 S.W. 454, 7 L.R.A.,N.S., 221, 117 Am.St.Rep. 89, 10 Ann.Cas. 423; 32 Am.Jur. 345, 745, 777; 1 Tiffany on Real Property, 3rd Ed., 245, § 150.

[3] Compare Rosen v. Wolff, 152 Ga. 578, 110 S.E. 877; Lewis v. Gollner, 129 N. Y. 227, 29 N.E. 81, 26 Am.St.Rep. 516; Gonzales v. Reynolds, 34 N.M. 35, 275 P. 922; 7 Thompson on Real Property, Permanent Edition, pp. 101–104, §§ 3614, 3615.

one in an equivalent position, a court of equity will treat the interests or equities created by a lessee in favor of third persons, under an agreement validly restricting the use of the property during his term, as if they were attached to the leasehold, without regard to their sufficiency to run with the estate at common law.

In the present case, State Investment and A. L. Kaplan, Inc. both expressly admit that they had knowledge of the restrictive agreement. The evidence strongly suggests, as a matter of fact, that Goldberg's dominant purpose as to both of these corporations, as well as on behalf of World Realty, was to effect the defeat or evasion of the restrictive agreement. The acceptance of a surrender, where there had been no breach sufficient to create a right of forfeiture, would, as we have indicated, leave State Investment in no better position, with respect to the equities existing against the leasehold for the remaining term of plaintiff's sublease, than if it had been a regular assignee. Similarly, the position in equity of A. L. Kaplan, Inc.

is no better than would have been that of a sublessee of such an assignee, with notice. As to both of them, the restrictive agreement, if it is valid, would clearly be enforcible in the present situation.

■ The validity of the agreement, as a restraint upon trade, is not seriously open to question under the general contract law of Nebraska. An agreement which places a restriction upon the use of certain real estate is not invalid in Nebraska, as being an unreasonable restraint of trade, where the restriction is purely ancillary to the acquiring of an interest in another piece of real estate for commercial purposes; where it places only a limited restraint as to period and manner of the use of such property; where it does not appear to be greater than reasonably to serve as a protection in accomplishing the legitimate commercial purpose for which the interest in the other real estate involved was acquired; and where it does not have as its primary object or as its direct result the fostering of some illegal monopoly.[4]

---

[4] See Wittenberg v. Mollyneaux, 60 Neb. 583, 83 N.W. 842; Herpolsheimer v. Funke, 1 Neb., Unof., 471, 95 N.W. 688; Engles v. Morgenstern, 85 Neb. 51, 122 N.W. 688; Downing v. Lewis, 59 Neb. 38, 80 N.W. 261, 262; Farmers' State Bank v. Petersburg State Bank, 108 Neb. 54, 187 N.W. 117; Dow v. Gotch, 113 Neb. 60, 201 N.W. 655; Roberts v. Lemont, 73 Neb. 365, 102 N.W. 770; Restatement, Contracts, § 515.

In Wittenberg v. Mollyneaux, supra, the owners of the only two hotels in the city of Sutton exchanged properties and one agreed that the property received by him should not be used for hotel purposes for a period of two years. In an action for breach, the court said (pages 842, 843 of 83 N.W.): "They [defendants] contend that, there being only two hotels in Sutton, the closing of one would give the owner of the other a monopoly, and that such a result would be prejudicial to the interests of the traveling public, and contrary to the policy of the state. We think the restriction upon the use of defendants' property was not unlawful. Contracts which impose unreasonable restraints upon the exercise of any business, trade, or profession are said to contravene sound public policy; but partial restraints are not deemed to be unreasonable when they are ancillary to an actual purchase of property, made in good faith, and are apparently necessary to afford fair protection to the purchaser.

Although such agreements tend to suppress competition, and bring about conditions favorable to the creation of monopolies, they are in harmony with the policy of the state, which is to promote commerce by facilitating the sale and transfer of property. Of course, if it be shown that the main purpose of the agreement is to secure a monopoly, and that the purchase of the property was a mere incident or means to that end, it is within the rule applicable to ordinary combinations in restraint of trade, and will not be enforced."

Again, in Engles v. Morgenstern, 85 Neb. 51, 122 N.W. 688, where, on the sale of a lumber stock and the leasing of a lumber yard site, the owner agreed not to engage, either directly or indirectly, in the lumber and coal business in the city of Auburn, Nebraska, or in the vicinity thereof, while the lessee remained in such business, except that, if the lessee discontinued the lease at the end of five years, the agreement should be void, the court said (pages 690, 691 of 122 N.W.): "We think * * * it is contracts in restraint of trade 'without limitation as to time and place' that are so stigmatized [as being prima facie void] and not such as afford only a fair protection to the interest of a purchaser and do not show an injury to the public interest. * * * It is apparent from a consideration of the contract in this case that the partial restraint of trade was

■ The restrictive agreement here involved adequately satisfies these general requirements of validity. Its apparent purpose was to prevent the use of the State Theatre by World Realty or its successors in interest, as a theatre, for a period of ten years, unless the Premier lease should be sooner terminated. The State Theatre was located only a block and a half from the World Theatre. The two theatres, during their previous operation, had drawn from the same general class of patronage. Experience had demonstrated that, when the State Theatre was closed, the receipts of the World Theatre increased "by at least fifty per cent of the gross income of the State Theatre". There were three other "first-run" motion picture theatres in the downtown district of Omaha, besides the World Theatre. The evidence shows that these four theatres were more than ample to take care of all available "first-run" patronage. There were also a number of "subsequent-run" theatres in both the business district and suburban areas, and there is nothing that purports even to suggest that the agreement in any way did or could operate to deprive the public of adequate facilities in this lower-priced field. As a matter of fact, so far as the restrictive agreement was concerned, World Realty or any other Goldberg corporation was free to open either a "first-run" or "subsequent-run" theatre at any other place in the city, except in the immediately competitive State Theatre location. There is no attempt to claim that the State Theatre building was the only other possible, practical theatre location in the city of Omaha; if other theatres had been necessary to satisfy the public demands. Nor could it even be argued that the agreement wholly destroyed the effective use of the property from a community standpoint,—for whatever force such an

argument might otherwise have—since no limitation was imposed upon the use of the building for anything except theatre purposes. A part of the building was in fact being used for other purposes at the time the restrictive agreement was made, and World Realty made the declaration, in connection with the transaction, that it was arranging to convert the theatre into a commercial garage.

Appellants contend, however, that, even if the restrictive agreement under ordinary circumstances might not be unreasonable, here it was actually "a part of a scheme and purpose to monopolize and to restrict the leasing and exhibition of first-run and other films in the Omaha area", and that it ought therefore to be declared to be unenforcible, as constituting a violation of the Sherman Anti-Trust Act, 26 Stat. 209, 210, 15 U.S.C.A. §§ 1-7, 15 note, and of the Junkin Act of Nebraska, Neb.Comp.St. 1929, §§ 59-801 and 59-802.[5]

Plaintiff at the time in question was operating three of the downtown "first-run" theatres in Omaha and held exhibitor's contracts for the original showing of the films of five of the eight leading film producers of the country. Brandeis Theatre, which was the only other "first-run" theatre in the downtown district, was operated by wholly different and unconnected interests, but held similar exhibitor's contracts for the films of the three other leading producers. Goldberg claimed that in 1933 and 1934 he had made inquiry of the representatives of the various producers in Omaha, to see whether he could obtain first-run films, if he desired them. He says that he was then giving consideration to the working out of some plan to take over the operation of the World and State Theatres, which were at the time being run by the trustee in bankruptcy of a

---

only collateral to the main contract which was that of the purchase of the business and stock of lumber and coal, and the leasing of the real estate upon which the business was conducted, and the duration of the restraint is limited * * *. We see nothing unreasonable in this contract on its face."

[5] Section 59-801, Neb.Comp.St.1929, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall

be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both."

Section 59-802 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, within this state, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both."

previous sublessee. Each of the film representatives told him in substance that, on the basis of their existing contracts, it would be impossible at the time to supply him with first-run films. It is this refusal which appellants now make the principal basis of their contention that a monopolistic conspiracy existed on the part of plaintiff, the Brandeis Theatre, and the various film distributors and producers, which was violative of the Junkin Act of Nebraska and of the Sherman Anti-Trust Act, and which therefore corrupted the restrictive agreement of the sublease transaction between World Realty and plaintiff.

The record shows that the separate statements of the several film representatives that their entire output of first-run films was at the time under local contract was an actual fact. There is no showing that the public was not properly being given the benefit of all the films available under these contracts. The fact that the representatives did not offer to see whether they could obtain a cancellation of any of these contracts for Goldberg's benefit would hardly be satisfactory proof of a monopolistic conspiracy. Goldberg did not claim that he had ever had any difficulty in contracting for subsequent-run films for the eight theatres which he was then operating, one of which was located in the downtown district. From his own estimate of the number of films manufactured by the eight producers referred to, it would appear that the total annual supply was not sufficient to supply even four theatres with enough first class films to present a weekly double feature bill, such as the public apparently demanded and as was the practice of the first-run theatres in Omaha. In fact, the testimony shows that one of the downtown theatres operated by plaintiff had at times been closed, partly because the supply of desirable films was inadequate. In addition, the evidence is convincing that, so far as patronage was concerned, the Brandeis Theatre and the theatres of plaintiff were highly competitive, and, if there was any conspiracy between them, inimical to the public interest, the circumstances before us do not sufficiently establish it.

But apart from all this, even if there was a combination to monopolize the exhibition of first-run films in Omaha, as appellants contend, the record fails to convince, by any reasonable inference or construction, that it was a motivating factor in the trans-

action of which the restrictive agreement was a part.

The evidence shows that in January, 1934, World Realty had made a previous sublease with Premier on the World and State Theatres, running to 1950, under which Premier was given the right to commercialize the State Theatre Building for other purposes, if it chose to do so. It undertook to run both theatres for a time, and then came to the conclusion that, in view of the limited and overlapping patronage field available and the dual operation expense involved, it would be more profitable to close the State Theatre and to serve its patronage at the World Theatre, which had abundant accommodations. It continued to pay its rent upon the State Theatre sublease, which ran until 1950, and under which it had the right to commercialize the building.

About this time, World Realty seems to have decided to dispose of its 99 year lease. The reason is not expressly indicated in the record, but there is an implication that one of its purposes was to liquidate the indebtedness for which the Omaha National Bank was holding part of the capital stock as collateral. In any event, World Realty approached A. H. Blank, who owned fifty per cent of the capital stock in plaintiff, and tried to interest him in purchasing the lease. The Omaha National Bank also used its influence to get Blank to make a deal. Blank replied that he was not interested in making a financial investment unless he could be certain that the State Theatre would be kept out of competition with the World. He suggested that World Realty should take back the State Theatre and should agree not to allow it to be used as a competing theatre for a period of ten years. World Realty readily assented to this condition. Goldberg himself testified: "We offered no objection; the World Realty was satisfied to include that." World Realty thus recognized that such a protection was reasonable and necessary in order to make the deal which it was soliciting, and the attorney for World Realty declared that they had already entered into negotiations to convert the State Theatre Building into a commercial garage.

Blank then agreed to pay $150,000 for an assignment of the 99 year lease on the World Theatre property—$50,000 in cash and the balance at the rate of $25,000 a year. Blank organized Commonwealth Theatres Corporation for the purpose of taking the

lease assignment and of executing the $100,000 obligation for the purchase price balance. As part of the transaction, World Realty cancelled the previous subleases held by Premier on the World and State Theatres and executed a new sublease on the World Theatre in favor of Premier, containing the restrictive agreement here in dispute. It may be noted in passing that Goldberg did not see fit to challenge the validity of the restrictive agreement during the four years that the $100,000 purchase price balance was being paid. The record is clear that the cancellation of the previous subleases, the execution of the new sublease with the restrictive agreement, and the purchase of the 99 year leasehold were all part of the same transaction, and that, without the restrictive agreement, neither the new sublease to Premier nor the assignment of the 99 year lease to Commonwealth would have been accepted.

Under all the circumstances of the transaction, it must be held that the restrictive agreement was intended simply and fairly to protect the interests created by the new sublease and the purchase of the 99 year leasehold; that it was only such a reasonable protection as any purchaser in good faith would have required under the circumstances of the transaction; that the situation which prompted the deal and the relationship in which the parties dealt afford no sound basis for inferring that it was dominated by any purpose of fostering an illegal monopoly under a previous combination and conspiracy, if any such combination ever had existed, as appellants contend; and that, so far as the public was concerned, it was not intended to and did not serve to achieve any such harmful or illegitimate result.

▓▓ In a further effort to escape the restrictive agreement, appellants argue that the Premier sublease should be treated as having become merged in the 99 year leasehold, because plaintiff afterwards acquired all of the stock in Commonwealth from Blank, and that in this situation the restrictive agreement of World Realty should be held to have been terminated. Plaintiff's ownership of the stock of Commonwealth did not make it the legal owner of the 99 year lease. Commonwealth was a separate corporation, and title to the leasehold remained in it. While equity may in certain situations disregard the artificiality of a corporate structure which is a mere form to shield a fraud, it certainly would not be justified in disregarding the entity merely to assist a party to escape a just and valid contractual obligation into which he has voluntarily and beneficially entered. Here there is no sound basis to ignore the separate, valid entities of Commonwealth and plaintiff or to refuse to recognize the rights which the law has accorded to them as distinct corporations.

▓ Indeed, even if plaintiff had taken a direct assignment of the 99 year lease from Commonwealth, equity would not in such a situation have been absolutely bound to treat this as a merger of the Premier sublease and an extinguishment of World Realty's restrictive agreement, but it would have had the right to examine all the circumstances, to ascertain the intention of the plaintiff at the time the two estates had been acquired, to weigh the equities of the parties in relation to the result, and from the whole situation to determine whether a merger should be recognized which might be claimed to have terminated the restrictive agreement. [6]

The views expressed sufficiently dispose of appellants' other contentions, without the need for further discussion. Plaintiff has suggested that Goldberg's interest in World Realty, State Investment and A. L. Kaplan, Inc. was such that the court would be justified in piercing all of the three corporate structures in order to prevent him from achieving his purpose to defeat or evade the restrictive agreement, but, in view of the result which is being reached, it is unnecessary to give consideration to that question.

The judgment of the trial court will be affirmed upon the grounds stated.

Affirmed.

[6] American Savings & Loan Ass'n v. Barry, 123 Neb. 523, 243 N.W. 628, 631; Citizens' State Bank v. Petersen, 114 Neb. 809, 210 N.W. 278, 279; Anderson v. Lincoln Joint Stock Land Bank, 131 Neb. 150, 267 N.W. 355, 360; Peterborough Savings Bank v. Pierce, 54 Neb. 712, 75 N.W. 20, 21; Gardiner v. Washington Loan & Trust Co., 61 App.D.C. 330, 62 F.2d 869, certiorari denied 289 U.S. 731, 53 S.Ct. 527, 77 L.Ed. 1480; 9 Thompson on Real Property, Permanent Edition, p. 488, § 5040.