## SCHINE CHAIN THEATRES, INC. ET AL. *v.* UNITED STATES.

No. 10.  Argued December 15, 1947.—Decided May 3, 1948.

*Bruce Bromley* argued the cause for appellants. With him on the brief were *Willard S. McKay, Alfred McCormack* and *Richard T. Davis. Harold R. Medina, Arthur Garfield Hays* and *Osmond K. Fraenkel* were also of counsel.

*Robert L. Wright* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, Stanley M. Silverberg* and *Philip Marcus.*

*Milton Pollack* filed a brief for Lawrence J. Carkey et al., as *amici curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a companion case to No. 64, *United States* v. *Griffith, ante,* p. 100, and is here by way of appeal from the District Court. The appellants, who were defendants below, are a parent company, three of its officers and directors, and five of its wholly owned subsidiaries— to whom we refer collectively as Schine. As of May 19, 1942, Schine owned or had a financial interest in a chain .of approximately 148 motion picture theatres[1] located in 76 towns in 6 states,[2] the greater portion being 78 theatres in 41 towns in New York and 36 theatres in 17 towns in Ohio. Of the 76 towns, 60 were closed towns, *i. e.,* places where Schine had the only theatre or

---

[1] These figures do not include 18 which were closed and had been or were being converted to other uses.

[2] New York (78), Ohio (36), Kentucky (18), Maryland (12), Delaware (2), Virginia (2).

all the theatres in town.[3]  This chain was acquired beginning in 1920 and is the largest independent theatre circuit in the country.  Since 1931 Schine acquired 118 theatres.  Since 1928 the closed towns increased by 56. In 1941 there were only three towns in which Schine's competitors were playing major film products.

The United States sued to prevent and restrain appellants from violating §§ 1 and 2 of the Sherman Act.  26 Stat. 209, 50 Stat. 693, 15 U. S. C. §§ 1, 2.  The complaint charged that the Schine interests by pooling their entire circuit buying power in the negotiation of films from the distributors so as to combine its closed and open towns got advantages for itself and imposed restrictions on its competitors which otherwise would not have been possible.  It charged that the distributors granted certain favors to Schine which were withheld from Schine's competitors, e. g., giving Schine the first run, refusing at times second runs to Schine's competitors, charging Schine with lower rentals than it charged others, licensing to Schine films in excess of Schine's reasonable requirements.

The complaint also charged that Schine had forced or attempted to force competitors out of business and where competitors would not sell out to Schine had threatened to build or had built an opposition theatre, had threatened to deprive or had deprived competitors of a desirable film or run, had cut admission prices, and had engaged in other unfair practices.  In these and other ways it was charged that Schine had used its circuit buying power to maintain its monopoly and to

---

[3] Schine had the only theatre in each of 21 towns, both theatres in 21 towns that had two each, all theatres in 16 towns that had three each, and all theatres in one town that had six theatres and in another that had four theatres.

Of these theatres approximately 87 per cent are located in cities or villages with populations under 25,000 and 60 per cent in cities or villages with populations under 10,000.

restrain trade. The conspiracy charged was between the Schine defendants themselves and between them and the distributors.

The District Court found that the appellants had conspired with each other and with the eight major film distributors [4] to violate § 1 and § 2 of the Sherman Act. Its findings may be summarized as follows:

The entire circuit buying power was utilized to negotiate films for all the theatres from the distributors, the negotiations ending in master agreements between a distributor and the exhibitor. This large buying power [5] gave Schine the "opportunity to exert pressure on the distributors to obtain preferences." Moreover, Schine by combining its closed and open towns in its negotiations for films was able "to dictate terms to the distributors." Schine bought films for some theatres in which it had no financial interest (but as respects most of which it had an option to purchase). It also performed the service (under so-called pooling agreements) for groups of theatres in which it and others were interested. Through the use of such buying power Schine arbitrarily deprived competitors of first- and second-run pictures, was able in many towns to secure unreasonable clearances [6] year after year of from 90 to 180 days, obtained long-term agreements for rental of film (franchises) which gave it preferences not given independent operators,[7] and re-

---

[4] Fox, Loew, Paramount, RKO, Warner, Columbia, Universal, and United Artists.

[5] In the 1939–1940 season Schine paid $1,647,000 to six distributors in film rental.

[6] By clearance is meant the period of time agreed upon which must elapse between runs of the same feature within a particular area or in specified theatres.

[7] The District Court used "independents" or "independent operators" to mean competitors other than the exhibitor-distributors. Schine, of course, is an independent circuit, as that term is used in the industry.

ceived more advantageous concessions from the distributors respecting admission prices than competitors were able to get. Schine made threats to build or to open closed theatres in order to force sales of theatres in various towns or to prevent entry by an independent operator. Schine cut admission prices. Schine obtained from competitors whom it bought out agreements not to compete for long terms of years which agreements at times extended to other towns as well. Schine obtained film-rental concessions not made available to independents. The District Court entered a decree enjoining these practices and requiring a divestiture by Schine of various of its theatres. 63 F. Supp. 229.

*First.* For the reasons stated in *United States* v. *Griffith, ante,* p. 100, the combining of the open and closed towns for the negotiation of films for the circuit was a restraint of trade and the use of monopoly power in violation of § 1 and § 2 of the Act. The concerted action of the parent company, its subsidiaries, and the named officers and directors in that endeavor was a conspiracy which was not immunized by reason of the fact that the members were closely affiliated rather than independent. See *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 227; *United States* v. *Crescent Amusement Co.,* 323 U. S. 173. The negotiations which Schine had with the distributors resulted in the execution of master agreements between the distributors and exhibitors. This brought the distributors into unlawful combinations with the Schine defendants. See *United States* v. *Paramount Pictures, Inc., post,* p. 131. The course of business makes plain that the commerce affected was interstate. *United States* v. *Crescent Amusement Co., supra,* pp. 180, 183–184.

*Second.* Appellants object to admission in evidence of numerous inter-office communications between officials of the distributors with whom Schine dealt. The District Court placed considerable reliance on them in mak-

ing its findings. We will advert later to the use of these documents to prove the unreasonableness of clearances. It is sufficient at this point to say that since a conspiracy between Schine and each of the named distributors was established by independent evidence, these inter-office letters and memoranda were admissible against all conspirators as declarations of some of the associates so far as they were in furtherance of the unlawful project. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 249; *United States* v. *Crescent Amusement Co., supra,* p. 184; *United States* v. *Gypsum Co.,* 333 U. S. 364, 393.

*Third.* Appellants make detailed challenges to many of the other findings of the District Court on which it based its holdings that appellants violated the Act.

(1) They vigorously attack the findings that Schine arbitrarily deprived independents of first- and second-run pictures. Their chief contention is that there is no support for the finding of arbitrary action on the part of Schine, that Schine did not buy pictures beyond its needs in order to keep them away from its competitors, that any successful purchaser of a first- or second-run picture has an exclusive privilege that necessarily deprives competitors of the film for the period of the run, and that any advantage which Schine obtained in this regard was the result of the operation of forces of competition.

As we read the evidence underlying this finding, it was the use of Schine's monopoly power—represented by combining the buying power of the open and closed towns—which enabled it to obtain that which its competitors could not obtain. Deprivation of competitors of first- and second-run pictures in that way was indeed arbitrary in the sense that it was the product of monopoly power, not of competitive forces. That is the construction we give the finding of the District Court; and as so construed it is supported by substantial evidence. There may be exceptions in the case of some subsidiary

findings. But we do not stop to relate them. For even if we lay them aside as clearly erroneous for lack of support in the evidence, the conclusion is irresistible that Schine so used its monopoly power to gain advantages and preferences which, on a purely competitive basis, it could not have achieved.

(2) Defense of the long-term film-rental agreements—the franchises—is made on the ground that they were accepted methods of doing business in the industry,[8] that they were favored by distributors as devices to stabilize their end of the business and to save expense, and that they were not chosen by Schine as instruments to suppress competition. But it seems to us apparent that their use served to intensify the impact of Schine's monopoly power on its competitors. For when Schine's buying power was used to acquire films produced by a distributor for two or three years rather than for one year alone, it plainly strengthened through the exercise of monopoly power such dominant position as Schine had over each of its competitors.

Appellants also challenge the finding that Schine obtained preferences through the franchises, in addition to long-term supplies of pictures, which were not granted independent operators. One of these preferences was found to be the unfair and inequitable clearance provisions; another, special film-rental concessions. We will consider these later. The other aspects of the findings we do not stop to analyze. For the franchise agreements as employed by Schine are unreasonable restraints of trade for the reasons stated; and they must be permanently en-

---

[8] A consent order was entered in the present case on May 19, 1942, which provided, *inter alia*, that appellants would not enter into any agreement licensing films released by any distributor during a period of more than one year and that all agreements in existence having a longer term should be void as to all films released after the thirtieth day following the date of the consent order.

joined, even though we assume their collateral aspects are not accurately described by the District Court and so may not be condemned.

(3) Appellants challenge the finding that Schine made threats to build theatres or to open closed ones in order to force sales of theatres in various towns or to prevent entry by an independent operator. There are inaccuracies in some of the subsidiary findings. There are episodes which are susceptible of two interpretations, one wholly innocent and the other unlawful. There are still other episodes which have the unmistakable earmarks of the use of monopoly power with intent to expand an empire and to restrain competition. On the whole we think the District Court was justified in drawing the inference of unlawful purpose from the ambiguous episodes and that those coupled with the others are adequate to support these findings of the District Court.

(4) We reach the same result as respects the agreements not to compete which Schine exacted from competitors whom it bought out. It is not enough that the agreements may be valid under local law. Even an otherwise lawful device may be used as a weapon in restraint of trade or in an effort to monopolize a part of trade or commerce. Agreements not to compete have at times been used for that unlawful purpose. See *United States* v. *American Tobacco Co.,* 221 U. S. 106, 174; *United States* v. *Crescent Amusement Co., supra,* p. 181. If we had here only agreements not to compete, the inferences drawn by the District Court might not be warranted. But in the setting of this record, and against the background of Schine's other monopolistic practices, it seems to us that the District Court might infer that the requisite purpose was present and that these agreements were additional weapons in Schine's arsenal of power through the use of which its monopoly was sought to be extended.

(5) The finding that Schine obtained film-rental concessions not made available to independent operators is not intelligible to us. For the District Court went on to state that "These provisions were also in contracts with independents." How those concessions constitute a restraint of trade is therefore not apparent. We set aside this finding so that it may be clarified on remand of the cause.

(6) There is challenge to the findings that Schine's rental agreements contained minimum admission prices, or minimum admission prices lower than those to be charged by the independent operators for subsequent runs, or relieved Schine of requirements for minimum admission prices though imposing them on its competitors. There is evidence to support the findings that minimum prices were fixed. It is well settled that the fixing of minimum prices, like other types of price fixing, is unlawful *per se*. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150. The findings that Schine was either granted minimum admission prices more favorable than those required of its competitors, or that Schine, unlike its competitors, was relieved of all requirements for minimum prices, are also supported by evidence. It is said that these provisions of the agreements were not adhered to. But since they did exist, it is not for us to speculate as to what force or sanction they may have had.

(7) There is also challenge to the finding that Schine cut admission prices. This seems uncontroverted. But price cutting without more is not a violation of the Sherman Act. It is indeed a competitive practice which this record shows to have been common in the industry. It may be used in violation of the Act. Thus it may be the instrument of monopoly power to eliminate competitors or to bring them to their knees. But since it is not unlawful *per se*, facts and circumstances must be adduced to show that it was in purpose or effect employed as an

instrument of monopoly power. Here there is nothing except a bare finding that at times Schine cut admission prices. That finding is not sufficiently discriminating to withstand analysis and is not adequate to support an injunction against price cutting.

(8) The finding as to unreasonable clearances presents rather large issues. We have elaborated the point in *United States* v. *Paramount Pictures, Inc., post,* p. 131, and need not repeat what is said there. Clearance is an agreement by a distributor not to exhibit a film nor to license others to do so within a given area and for a stated period after the last date of the showing of the film by the licensee with whom the agreement is made.[9] It is, in other words, an agreement by a distributor to license films only for specified successive dates. It is in part designed to protect the value of the license which is granted. While it thus protects the income of the first exhibitor, there is no contention that clearance agreements are *per se* unlawful restraints on competition by reason of the effect they may have on admission prices or otherwise. All the District Court purported to condemn, and all the appellee maintains is unlawful, are "unreasonable clearances." If reasonableness is the test, the factors which bear on it would appear to be numerous.[10] The findings and opinion of the District Court, however, do not greatly

---

[9] See note 6, *supra.*

[10] See Bertrand, Evans & Blanchard, The Motion Picture Industry—A Pattern of Control 40–41 (TNEC Monograph No. 43, 1941):

"The establishment of clearance schedules is an intricate procedure. It involves a complex bargaining process and the balance of a variety of opposing economic interests. It may be stated initially that the primary objective of the distributor is, of course, to maximize his total revenue from each picture. This aim gives him a very direct interest in clearance periods. The higher rental fees paid by the prior-run exhibitor are directly conditioned on the extent of the protection which he is granted, and in general the longer the clearance

illuminate the problem. What standards or criteria of unreasonableness were applied does not clearly appear. There are, however, in some of the subsidiary findings in this case a few clues as to the basis used by the District Court in classifying clearances as unreasonable. Thus it said that Schine got some clearances "over towns in which Schine did not operate." But that is irrelevant to the problem of reasonableness of clearances, since by definition clearances run to both theatres and towns not owned by him who has the clearance.

The District Court also found that clearances "were given over towns over which there had been no previous clearance." But that without more would not make a clearance "unreasonable." The District Court found that Schine got clearances over "some towns distant from 10 to upwards of 20 miles" and that clearances were also obtained over "outside towns of comparably small popula-

---

period before subsequent showing, the higher the rental fee the prior-run exhibitor will pay.

"On the other hand, the distributor's revenue from subsequent-run exhibition is also important to him; this income may mean the difference between black or red ink on his ledgers. But the longer the clearance period, the smaller will be these returns—not only because more customers will have attended the prior showing rather than wait for subsequent exhibition, but also because the effects of the advertising and exploitation efforts made when the picture was released will have been vitiated over this time. In general, the greater the total box-office return earned by a film in all showings, the greater will be the distributor's revenue.

.     .     .     .     .

"The relation between run, clearance and zoning, admission price, seating capacity, and rental fees is indeed a complex one. The range covered by these factors is indicated by this fact: a license fee amounting to many thousands of dollars may be paid for the first showing of a film in a large metropolitan theater, and within a year the same film may be exhibited in some small theater in the same city for a fee of less than $20."

tion, distant so far that no clearance is justified." If the basis for these findings is that the towns were in different competitive areas, it would come closest to revealing the standard used by the District Court in determining whether the clearances were or were not reasonable, unless possibly it be the finding that in a few instances Schine got clearances over towns where there were no theatres.

The District Court cites instances of clearances which in its view were illegal because unreasonable as to time. But some of these turn out to be situations where clearances were granted over towns where Schine had the only theatre in town. So perhaps the District Court used as a basis for some of its findings of unreasonable clearances the absence of any competition between the theatres in question. But as to that we can only guess in each case and then wonder whether our guess was correct, because appellee suggests that one vice of Schine's clearances was that they ran not to specified theatres but to specified towns. We are, however, left somewhat in the dark whether the District Court followed that theory or made the reasonableness of clearances turn on whether or not the theatres affected were in different competitive areas.

Appellee also suggests that proof of the unreasonableness of Schine's clearances is that their periods were almost uniformly the same even though there were wide variations in the condition and size of theatres and of the type of pictures played in the various theatres. But we are given no clue in the findings whether that was the view of the District Court. On its face it seems more like an attempt of the appellee to show what findings could have been made on the basis of the record had some discrimination been made in appraising the evidence.

Appellee seems to argue that standards of reasonableness can be dispensed with by reason of statements in the

inter-office memoranda of the distributors that many of Schine's clearances were "unreasonable." On the matter of clearances, however, the interests of distributors and exhibitors are not necessarily identical. For the self-interest of exhibitors which would call for long clearances would militate against the best interests of distributors.[11] So it is not clear that these declarations can properly be said to fall within the scope of the unlawful project which the two groups were sponsoring. Cf. *Pinkerton* v. *United States*, 328 U. S. 640, 647–648. But however that may be, these statements do not advance us very far with the problem because they too fail to give specific content to the concept of unreasonable as applied to clearances.

As a last resort appellee seeks to sustain these findings on the ground that Schine got at least some of its clearances by refusing to make any deal for the circuit unless its terms were met. But any clearance so obtained, though otherwise reasonable, would be unlawful, for it would be the product of the exercise of monopoly power. It is evident, however, that that was not the theory adopted by the District Court for it did not look to see what clearances had been obtained in that manner.

The short of the matter is that since we do not know for certain what the findings of the District Court on clearances mean, they must be set aside. In doing so we of course do not intimate here, any more than we do in case of the other findings we have set aside in the case, that the record would not sustain findings adverse to Schine. We only hold that before we can pass on the questions tendered, findings on clearances must be made which reflect an appraisal of the complex of factors bearing on this question of reasonableness. That is a function of the District Court.

---

[11] See note 10, *supra*.

*Fourth.* The decree entered by the District Court enjoins appellants from specified acts or practices.[12] To the extent that these provisions are directed to practices reflected in findings which we set aside, they must be re-examined by the District Court on remand of the case.

Appellants object to the generality of the injunction against "monopolizing" first- and second-run films.[13] The

---

[12] This part of the decree provides:

"Each of the defendants is hereby enjoined and restrained:

"1. From monopolizing the supply of major first run films in any situation where there is a competing theatre suitable for first run exhibition thereof and from monopolizing the supply of second run film in any situation where there is a suitable theatre for second run exhibition thereof.

"2. From demanding or receiving clearance over theatres operated by others which unreasonably restricts their ability to compete with a theatre owned or operated by a defendant corporation controlled by it and from attempting to control the admission prices charged by others by agreement with distributors, demands made upon distributors, or by any means whatsoever.

"3. From conditioning the licensing of films in any competitive situation outside of Buffalo, New York, upon the licensing of films in any other situation and from entering into any film franchise.

. . . . .

"5. From enforcing any existing agreements heretofore entered into (1) not to compete or (2) to restrict the use of any real estate to non-theatrical purposes.

"6. From using any threats or deception as a means whereby a competitor is induced to sell.

"7. From continuing any contract, conspiracy or combination with each other or with any other person which has the purpose or effect of maintaining the exhibition or theatre monopolies of the defendants or of preventing any other theatre or exhibitor from competing with the defendants or any of them, and from entering into any similar contract, conspiracy, or combination for the purpose or with the effect of restraining or monopolizing trade and commerce between the States."

[13] See note 12, *supra*, paragraph 1.

statutory requirement is that these injunctions "shall be specific in terms, and shall describe in reasonable detail, and not by reference to the bill of complaint or other document, the act or acts sought to be restrained." 38 Stat. 738, 28 U. S. C. § 383. And see Fed. R. Civ. P., 65 (d). We need not determine whether the provision in question if read, as it must be, in light of the other paragraphs of the decree (*Swift & Co.* v. *United States,* 276 U. S. 311, 328) would pass muster. For we think the public interest requires that a more specific decree be entered on this phase of the case. The precise practices found to have violated the act should be specifically enjoined.

We have considered the objections to the other parts of the injunction (apart from provisions as to divestiture which we discuss later) and find them without merit.

*Fifth.* The District Court included in its decree a divestiture provision adjudging that appellant companies be "dissolved, realigned, or reorganized in their ownership and control so that fair competition between them and other theatres may be restored and thereafter maintained." The parties subsequently submitted various plans and after hearings the one submitted by the Department of Justice was approved with modifications. The plan does not provide for the dissolution of the Schine circuit through the separation of the several affiliated corporations as was done in *United States* v. *Crescent Amusement Co., supra,* pp. 188–189. It keeps the circuit intact in that sense but requires Schine to sell certain theatres. The plan requires Schine to sell its interest in all but one theatre of its selection in each of 33 towns, all but two in each of four larger towns, and two of four theatres in Rochester, New York.[14] Schine is to be divested of

---

[14] It also requires Schine to sell specific theatres remaining unsold under the consent decree of May 19, 1942.

more than 50 of its theatres. The towns affected are over 40 out of the 70-odd in which Schine is operating.[15] The one-theatre towns of Schine are unaffected.

The decree also dissolves the pooling agreements. A trustee is appointed to make the sales which are ordered. Schine is prohibited from acquiring any financial interest in additional theatres "except after an affirmative showing that such acquisition will not unreasonably restrain competition." Schine is ordered not to buy or book films for any theatre other than those in which it owns a financial interest. The District Court concluded that this program of divestiture was necessary in order to restore "free enterprise and open competition amongst all branches of the motion picture industry."

As we have noted, the District Court did not follow the procedure of *United States* v. *Crescent Amusement Co., supra,* and order the dissolution of the combination of the affiliated corporations. Schine presented such a plan and it was rejected. That plan contemplated the division of the Schine theatres among three separate corporations, with members of the Schine family owning each corporation. The District Court rejected that plan because it did not furnish such separation of ownership as would assure discontinuance of the practices which had constituted violations of the Act. The District Court did not pursue further the prospect of dismemberment of the Schine circuit through separation of the theatres into geographical groupings under separate and unaffiliated ownerships. Nor do the findings reflect an inquiry to determine what theatres had been acquired by Schine through methods which violate the Act. So far as the findings reveal, the theatres which are ordered divested may be properties which in whole or in part were lawfully ac-

[15] Schine had withdrawn from five towns pursuant to the consent order of May 19, 1942.

quired; and theatres which Schine is permitted to retain may, so far as the findings reveal, be ones which it obtained as the result of tactics violating the Act.

In this type of case we start from the premise that an injunction against future violations is not adequate to protect the public interest. If all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact. They could retain the full dividends of their monopolistic practices and profit from the unlawful restraints of trade which they had inflicted on competitors. Such a course would make enforcement of the Act a futile thing unless perchance the United States moved in at the incipient stages of the unlawful project. For these reasons divestiture or dissolution is an essential feature of these decrees. See *United States* v. *Crescent Amusement Co., supra,* p. 189, and cases cited.

To require divestiture of theatres unlawfully acquired is not to add to the penalties that Congress has provided in the antitrust laws. Like restitution it merely deprives a defendant of the gains from his wrongful conduct. It is an equitable remedy designed in the public interest to undo what could have been prevented had the defendants not outdistanced the government in their unlawful project. Nor is *United States* v. *National Lead Co.,* 332 U. S. 319, 351–353, opposed to this view. For in that case there was no showing that the plants sought to be divested were either unlawfully acquired or used in a manner violative of the antitrust laws.

Divestiture or dissolution must take account of the present and future conditions in the particular industry as well as past violations. It serves several functions: (1) It puts an end to the combination or conspiracy when that is itself the violation. (2) It deprives the antitrust defendants of the benefits of their conspiracy.

(3) It is designed to break up or render impotent the monopoly power which violates the Act. See *United States* v. *Crescent Amusement Co., supra,* pp. 188–190; *United States* v. *Griffith, ante,* p. 100.

The last two phases of this problem are the ones presented in this case. But the District Court purported to deal with only one of them. It did not determine what dividends Schine had obtained from the conspiracy. In *United States* v. *Crescent Amusement Co., supra,* pp. 181, 189, some of the affiliated corporations through which that empire was built were products of the conspiracy. Hence that fact without more justified the direction in the decree to unscramble them. There are no findings which would warrant such a course in this case. But an even more direct method of causing appellants to surrender the gains from their conspiracy is to require them to dispose of theatres obtained by practices which violate the antitrust acts. We do not know what findings on that score would be supported by the record, for the District Court did not address itself to the problem. The upshot of the matter is that the findings do not reveal what the rewards of the conspiracy were; and consequently the court did not consider what would be the preferable way of causing appellants to surrender them. The case must therefore be remanded so that the District Court may make appropriate findings on this phase of the case.

While such an inquiry is the starting point for determining to what extent divestiture should be ordered, the matter does not end there. For it may be that even after appellants are deprived of the fruits of their conspiracy, the Schine circuit might still constitute a monopoly power of the kind which the Act condemns (see *American Tobacco Co.* v. *United States,* 328 U. S. 781, 809, 811), in spite of the restrictive provisions of the decree.

Monopoly power is not condemned by the Act only when it was unlawfully obtained. The mere existence of the power to monopolize, together with the purpose or intent to do so, constitutes an evil at which the Act is aimed. *United States* v. *Griffith, ante,* p. 100; *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 432. But whether that condition will obtain in this case must await the findings on the other phase of the case.

We accordingly set aside the divestiture provisions of the decree so that the District Court can make the findings necessary for an appropriate decree. We approve the dissolution of the pooling agreements, the prohibition against buying or booking films for theatres in which Schine has no financial interest, and the restriction on future acquisitions of theatres. See *United States* v. *Crescent Amusement Co., supra,* pp. 185–187. We do not reach the question of the appointment of a trustee to sell theatres as that merely implements the divestiture provisions which must be reconsidered by the District Court.

The judgment of the District Court is affirmed in part and reversed in part and the cause is remanded to it for proceedings in conformity with this opinion.

*So ordered.*

MR. JUSTICE FRANKFURTER concurs in the result.

MR. JUSTICE MURPHY and MR. JUSTICE JACKSON took no part in the consideration or decision of the case.