**SOUND SHIP BUILDING CORP., a New York Corporation, Plaintiff,**

v.

**BETHLEHEM STEEL CORP., a Delaware Corporation, Defendant.**

**Civ. A. No. 112-73.**

United States District Court,
D. New Jersey.

Jan. 8, 1975.

Hannoch, Weisman, Stern & Besser by James A. Scarpone, Newark, N. J., for plaintiff.

Riker, Danzig, Scherer & Brown by Dickinson R. Debevoise, Newark N. J., for defendant.

## OPINION

COOLAHAN, District Judge.

This action and the presently pending motion for summary judgment by defendant Bethlehem Steel Corporation and the cross-motion for partial summary judgment as to liability by plaintiff Sound Ship Building Corporation concern the issue of the validity, under § 1 of the Sherman Act, 15 U.S.C. § 1, of a covenant between buyer and seller restricting for a 20-year period the uses to which real property can be put. Plaintiff argues that the covenant violates the Sherman Act whether tested by the per se or "reasonableness" standard of illegality. The Court disagrees. The per se standard is inapplicable to the facts of this case, and the covenant when measured by traditional reasonableness standards is not violative of the law.

Plaintiff Sound Ship Building Corporation (Sound), a New York corporation, was engaged in the construction and repair of non-self-propelled barges at its facility at College Point, New York. Its business was equally divided between barge construction and repair. In the

New York City harbor area Sound was the sole business that constructed new barges, but was one of at least eleven businesses engaged in barge repair.

Bethlehem's primary business is the construction and repair of ocean-going vessels. Bethlehem does no barge construction, but does some barge repair work at its Hoboken, New Jersey, facility.

Prior to 1970 neither Sound nor Bethlehem was "aware" of the barge work of the other. Consequently, neither regarded the other as a present or future competitor.

In the early 1960s the ship building industry in the New York harbor was in a general state of decline.[1] During this period, Bethlehem sold all but one of its parcels of harbor-front property. Each deed contained a restrictive covenant similar to the one which accompanied the sale on August 20, 1964 of property located on Staten Island known as "Mariner's Harbor" to JML Trading Company (JML). JML is in the real estate business. In relevant portion the restrictive covenant in the Mariner's Harbor deed mandated that:

The Grantee, for itself and its successors and assigns hereby covenants with the Grantor, and its successors and assigns, that no part of the Premises is to be used for the business of drydocking, building, repairing (including painting below the light load line), or converting ocean-going ships, ferry boats, or harbor craft; provided, however, this restriction shall not apply: (a) to the drydocking, building, repair or conversion of pleasure craft (yachts and similar small pleasure boats); or (b) to any such activities which are required to be conducted at the Premises in times

of national emergency by governmental action. This covenant shall continue in full force and effect for twenty (20) years from the date of this deed, shall run with the land, and shall bind the Grantee, and its successors and assigns. The Grantee shall include the foregoing covenant in any lease or conveyance of the Premises or of any part thereof made by it during such period of twenty (20) years and shall include in each conveyance made of the Premises or any part thereof during such period a provision requiring the Grantee, its successors and assigns, to include this restriction in any subsequent conveyance made during such twenty-year period.

In 1969, five years after Bethlehem's sale of the Mariner's Harbor property, Sound learned that, upon expiration in 1972, its lease at College Point would not be renewed. Consequently in 1971 Sound began searching for a new site for lease or purchase. After reviewing approximately 30 possible alternatives, Sound determined that the only property "truly suitable" for its purposes was Mariner's Harbor. Sound's determination rested not only on financial and physical considerations but also on considerations of immediate availability.[2]

Accordingly, Sound, with JML's support, sought from Bethlehem a waiver of the restrictive covenant. Bethlehem initially refused,[3] but later offered to waive the restrictions if Sound agreed to pay Bethlehem a yearly premium of approximately $19,000 for the remaining 13 years of the covenant. Sound refused to lease or purchase the property on these terms.

Sound ultimately leased property in Hoboken, New Jersey. The property lacked launching ways capable of utiliz-

---

1. The barge repair business tends to be cyclical because it depends on the level of construction in the New York area.

2. Although many sites were physically suitable, or could be made physically suitable for Sound's purposes (for example, by the erection of new bulkheads), each was rejected for a variety of reasons including cost. At

Mariner's Harbor there was no need for alterations and Sound could have begun operations immediately.

3. Bethlehem's initial refusal was based at least partially on the determination that a waiver (a) would inevitably reduce its volume of repair business, and (b) would threaten its potential supply of skilled labor.

ing Sound's new dry dock, upon which Sound was relying to increase its business. Sound agreed to pay at Hoboken an annual rent $14,770 higher than the combined cost of rent plus the yearly premium demanded by Bethlehem at Mariner's Harbor. Subsequent to leasing the property at Hoboken, Sound's financial condition deteriorated and it went out of business.

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is hereby declared to be illegal . . . ."[4] Courts have uniformly read the act to prohibit only unreasonable restraints.[5] Courts have distinguished "naked" covenants not to compete, deemed per se violations of the Sherman Act, from covenants merely ancillary to a main lawful contract. The latter, unlike the former, must be examined to determine if they are so unreasonable as to violate the antitrust laws. United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); Orbo Theatre Corp. v. Loew's, Inc., 156 F.Supp. 770 (D.D.C.1959), aff'd, 104 U.S.App.D.C. 262, 261 F.2d 380 (1959), cert. denied, 359 U.S. 943, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959).

The distinction rests upon a judicial recognition that a seller of a business or property may legitimately need to protect himself by the use of reasonable means from injury at the hands of the buyer.[6]

A distillation of *Addyston* and its progeny identify four primary indicia of reasonableness of a restrictive covenant.[7]

1. The restraint is ancillary to the main purpose of a lawful contract.

2. The restraint is neither imposed by a party with monopolistic power nor fosters a monopoly.

3. The restraint is partial in nature and reasonably limited in time and scope.

4. The restraint is no greater than necessary to afford fair protection to the parties and not so extensive as to interfere with the interests of the public.

Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); Goldberg v. Tri-States Theatre Corp., 126 F.2d 26 (8th Cir. 1942); Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,[8] 315 F.Supp. 45 (S.D.N.Y.1970), aff'd, 437 F.2d 566 (2d Cir. 1970); United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y. 1960); Orbo Theatre Corp. v. Loew's,

---

4. Defendant argues that the facts disclose no contract, combination or conspiracy within the meaning of § 1. In light of the Court's decision that any contract, combination or conspiracy which did exist was reasonable, it is unnecessary to rule on this issue.

5. *E. g.*, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

6. Justice, then Judge, Taft, writing for the Court in *Addyston*, stated that

. . . it was certainly reasonable that the seller should be able to restrain the buyer from doing him injury which, but for the sale, the buyer would be unable to inflict.

7. Professor Handler has labeled the development of proper standards as the key problem before the courts in this area. H. J. Goldschmidt, "Antitrust's Neglected Step-

child: A Proposal for Dealing with Restrictive Covenants under Federal Law," 73 Colum.L.Rev. 1193.

8. These rules are stated with clarity in *Syntex Laboratories*, 315 F.Supp. at 56:

. . . it is hornbook law that a covenant not to compete ancillary to the sale of a business . . . when reasonably limited as to time and territory, does not fall within prohibitions of the Sherman Act. The question . . . is whether the restraint is reasonably calculated to protect the legitimate interests of the purchaser . . . or whether it goes so far beyond what is necessary as to provide a basis for the inference that its real purpose is the fostering of monopoly. Goldberg v. Tri-States Theatre Corp., 126 F.2d 26, 32 (8th Cir. 1942).

Inc., *supra*; United States v. Bausch & Lomb Optical Co., 45 F.Supp. 387 (S.D. N.Y.1942), aff'd 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944).

■ When these standards are applied in light of the evidence and factual circumstances surrounding the Mariner's Harbor deed, the covenant is not unreasonable within the meaning of § 1 of the Sherman Act.

1. The Mariner's Harbor covenant is ancillary to the main purpose of the contract—the lawful sale of property. Bethlehem underwent a general "house cleaning" of its harbor-front property motivated by economic conditions which made continuing maintenance of the property uneconomical. Plaintiff has alleged no facts to indicate that the prime purpose of the whole transaction was not the lawful sale of property.[9]

■ 2. The covenant is sufficiently limited in scope and time. Although restricting many shipyard activities, the covenant is not all-inclusive, but rather, limited to specific types of harbor activity, and expressly provides exceptions for pleasure craft. Thus there are viable shipyard purposes to which the property can be put. Standing alone, a 20-year restrictive covenant is unreasonable.[10] The fact, however, that the covenant was imposed (a) by a seller who retained at close proximity a similar business interest (b) in a market where viable alternative sites were available (c) during a period of economic decline in the business, enables the Court to find the covenant reasonable in time.

3. Plaintiff has not alleged facts to indicate that Bethlehem had monopolistic powers [11] in the barge construction or repair business at the time of the covenant's initiation nor adduced evidence that it was Bethlehem's intent [12] to develop such power or that in fact such has been the result at any time during the life of the covenant. Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948), where the Supreme Court found unlawful a covenant not to compete, is distinguishable because that covenant was part of a series of covenants that formed a larger plan to monopolize.

Sound strongly urges that there can be no dispute as to Bethlehem's anti-competitive motives which were designed specifically for the result it

9. Although the impact of agreements not to compete can be great in industries, such as barge repair and construction, that are particularly dependent on the supply of trained personnel, and Bethlehem stated that one of the reasons weighing against its waiver of the covenant was a feared increase of competition for a limited supply of skilled workers, sufficient evidence has not been adduced to indicate that this was the principal motivation for the transaction.

10. There is little federal precedent for determining a covenant's reasonableness in terms of time and scope. In Tri-Continental Finance Corp. v. Tropical Marine Enterprises, 265 F.2d 619 (5th Cir. 1959), the Court of Appeals upheld a restrictive covenant which prohibited a purchaser of a vessel from using that vessel for the purposes of ferry transportation between Cuba and the United States for ten years. The court, citing *Addyston*, held such covenant to be reasonable in time and territory and thus not violative of § 1.

11. In Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 196 Ct.Cl. 35 (1971), the Court of Claims stated that it is not always necessary before a § 1 violation could be proven to show an offending party's power in the market place if the motivation underlying its conduct is clear and such conduct has produced negative economic effects. In this matter, however, there must be interaction between all the elements before the true facet of any one element can be determined.

12. In Goldberg v. Tri-States Theatre Corp., 126 F.2d 26 (8th Cir. 1942), the court stated that even if there were a combination to monopolize, as the defendant contended, the record failed to demonstrate that such monopolization was a motivating factor in the transaction of which the restrictive agreement was part.

had—the elimination of Sound.[13] In support of its argument Sound marshals internal Bethlehem memoranda, the core of which indicates Bethlehem's opinion that a waiver of the covenant would prejudice Bethlehem's work by enhancing the potential competitive position of another. Based on these statements made in and about 1971 concerning the potential waiver in 1971 of the covenant, Sound leaps to the conclusion that through the initiation of the covenant in 1964 Bethlehem was seizing the opportunity to destroy Sound.[14] Plaintiff has blended events which cannot be mixed.

4. The restraints of the Mariner's Harbor covenant are not greater than necessary to afford protection to the parties and not so extensive as to interfere with the interests of the public. No facts have been alleged to indicate that the covenant in any way operates to deprive the public of adequate facilities at lower prices.[15]

Plaintiff vigorously urges that the Mariner's Harbor restrictive covenant falls within the category of agreements which have been condemned per se violations of § 1 of the Sherman Act. In support of this position plaintiff argues that the covenant (a) is so pernicious a naked anticompetitive agreement that no step-by-step analysis of its reasonableness is necessary and (b) can be included within the traditional categories of per se violations—horizontal and vertical price-fixing, agreements by competitors to divide markets, and group boycotts.[16] Although the Court agrees that certain restrictive covenants may be per se unreasonable and fit within the traditional classification of such violations, the determination of these issues to the Mariner's Harbor covenant is moot by virtue of the determination that the covenant is both ancillary to the main purpose of a lawful contract of sale and reasonable in its application.

The facts of this case are undisputed and the law is clear in its determination that the Mariner's Harbor covenant is not violative of § 1 of the Sherman Act. Accordingly, plaintiff's motion for partial summary judgment is denied and defendant's motion for summary judgment is granted.

13. Sound urges that the ultimate destruction of its business is "the most eloquent testimony that the covenant had exactly the anticompetitive impact it was intended to have." The Court is unable to accept this equation in light of the fact that Sound's profits increased during the first seven years of the covenant's life.

14. At the time the covenant came into force in 1964 the parties were unaware of the barge work of the other. Furthermore, with the addition of a 10,000-ton capacity floating dry dock in 1969, Sound's business potential as well as its physical needs in leasing or purchasing property changed drastically.

15. When a potential customer is excluded via a restrictive covenant from a regional shopping center, it generally means that he will be unable to locate in another center serving the same trade area since an alternative is not likely to exist. The lack of competition results in higher prices and poorer service for the public. This direct danger to the public, while very palpable in shopping centers, is unique to the type of industry and lease structure. Similar dangers are not inherent in the Mariner's Harbor situation where there are a number of existing competitors and a large number of possible alternative sites for new competitors and no apparent interference with the needs of the public. Furthermore in shopping center leases, the industrial structure allows the goals ordinarily reached by restrictive exclusionary covenants to be reached through the alternatives of a more narrowly drawn covenant. Plaintiff has offered no evidence to indicate that the alternatives of less restrictive covenants are available in the present matter. Note, "The Antitrust Implications of Restrictive Covenants in Shopping Center Leases," 86 Harv.L.Rev. 1201.

16. E. g., White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).