UNITED STATES of America,
Plaintiff,

v.

EMPIRE GAS CORPORATION,
Defendant.

No. 20485–1.

United States District Court,
W. D. Missouri, W. D.

May 6, 1975.

Thomas E. Kauper, Asst. Atty. Gen., Robert Eisen, Atty., Antitrust Div., Dept. of Justice, Chicago, Ill., for plaintiff.

Earl A. Jinkinson, Winston & Strawn, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I.

The transcripts of both the pretrial and trial proceedings in this case reflect the difficulties encountered in getting this case to trial on the merits. Although we denied defendant's motion to dismiss for plaintiff's failure to comply with this Court's post-trial order [Tr. 2101] in regard to the manner in which plaintiff's proposed findings of fact and proposed conclusions of law were to be submitted, our post-trial memorandum and order of May 22, 1974, recognized that it was quite apparent that plaintiff had not in fact complied with our directions that all proposed findings of fact were to be stated in "separately numbered sentences, appropriately supported by reference to the documentary or other evidence which has been adduced at trial" and that all proposed conclusions of law were to be stated in separately numbered paragraphs "in precisely the language which the government believes is applicable to the case."

Plaintiff's original proposed findings of fact, 269 pages in length, consisted of 331 numbered multi-sentence paragraphs (pages 1–170) and an "appendix to acquisition findings" (pages 171–269) which contained no paragraph numbers whatever and which, for the most part, merely quoted particular paragraphs from defendant's acquisition contracts made during the years 1963–1973. That appendix also contained raw data con-

cerning the purchase price paid, the storage capacity of the seller, the number of customers served, the volume of L–P gas sold, and, in some isolated instances, an estimate of the percentage of the market within a "trade area."

During the pendency of defendant's post-trial motion to dismiss, plaintiff amended its original filing by adding and numbering what it now calls 20 "separate headnotes." Plaintiff's failure to follow our post-trial directions makes it impossible for this Court to follow its usual practice in nonjury cases under which all proposed findings of fact and suggested conclusions of law submitted by both parties are considered and discussed with the precision implicit in the admonition stated in United States v. El Paso Gas Co., 376 U.S. 651, 656–57, 84 S.Ct. 1044, 12 L.Ed.2d 12, most recently reiterated in footnote 13 in United States v. Marine Bancorporation, 418 U.S. 602, 615, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). Indeed, the Court would be warranted in granting various of the defendant's motions to dismiss based upon the manner in which plaintiff has failed to comply with particular procedural orders made throughout the case.

It is our view, however, that cases should be decided on the merits rather than on procedural grounds. We shall accordingly make findings of facts on the merits in regard to what we believe was established by the weight of the credible evidence and state the conclusions of law applicable to those findings. Judgment will be rendered in favor of the defendant.

## II. FINDINGS OF FACT

1. On August 14, 1972, plaintiff United States of America filed its original complaint alleging that defendant Empire Gas Corporation and its various wholly-owned subsidiaries had violated Section 2 of the Sherman Act. An amended complaint was filed on June 22, 1973 in which an alleged violation of Section 1 of the Sherman Act was for the first time alleged.

2. Defendant Empire Gas Corporation (hereinafter "Empire") is a corporation organized and existing under the laws of the State of Missouri since 1963, with its principal place of business in Lebanon, Missouri.

3. Empire, through and in conjunction with its wholly-owned subsidiaries (the term "Empire" shall include these subsidiaries unless indicated otherwise) is and has been principally engaged in the retail and wholesale sale of liquefied petroleum gas in various states.

4. Liquefied petroleum gas (hereinafter "LP gas") includes various gases of the methane series which have been compressed into a liquid state, principal examples of which are propane and butane.

5. A substantial part of the LP gas which Empire purchases and resells regularly and continuously moves in interstate commerce.

6. Plaintiff alleged in its amended complaint that beginning in 1963 and continuing up until June 22, 1973, "the defendant and co-conspirators have entered into contracts, combinations, and conspiracies to unreasonably restrain * * * interstate trade and commerce in the distribution and retail sale of LP gas * * * *" in violation of Section 1 of the Sherman Act. We find that plaintiff failed to prove that Empire has at any time entered into any such contract, combination or conspiracy.

7. Plaintiff also alleges that beginning in 1963 and continuing up until June 22, 1973 "the defendant has attempted to monopolize * * * interstate trade and commerce in the distribution and retail sale of LP gas in various local marketing areas within the State of Missouri and other states in which the defendant operates * * *," in violation of Section 2 of the Sherman Act. We find that plaintiff failed to prove that Empire has at any time attempted to monopolize the distribution

and retail sale of any product in any relevant market area.

8. We further find that in regard to Empire's alleged violation of Section 2, plaintiff failed to prove that LP gas is a relevant product market constituting a "part of the trade or commerce," within the meaning of that Section. Although the evidence offered by plaintiff did not focus with particularity on the question presented, it generally established that LP gas is functionally interchangeable in virtually every one of its common uses with such other fuels and energy sources as natural gas.

9. Plaintiff, in an effort to prove various "local marketing areas" in which Empire allegedly attempted to monopolize the distribution and retail sale of LP gas, offered thirteen exhibits, each bearing a different designation such as "Lebanon Market Area" [GX 151–B], which purport to be various sections of road maps upon which dark, continuous lines of varying size and shape have been drawn. No credible evidence was adduced to establish the methodology or underlying data used in drawing these lines. Indeed, the Court still does not know how, why, and by whom the lines were drawn. The testimony of a Department of Justice staff economist suggests that the lines were drawn by some member of plaintiff's legal staff prior to that economist's initial contact with this lawsuit. No evidence was adduced to qualify the unidentified lawyer as an expert. In short, we find that plaintiff did not offer any credible evidence to prove that its "local marketing areas" did in fact reflect areas in which any LP gas companies effectively competed, or areas to which any purchasers could practically turn for their supplies of LP gas.

10. Even if it could be assumed that plaintiff's evidence could be said to have established appropriate geographical areas, we find that plaintiff failed to offer any credible evidence sufficient to establish that, Empire in fact possessed a specific intent to achieve a monopoly or to acquire monopoly power in the distribution or retail sale of LP gas.

11. In further regard to the Section 2 geographic market question, we expressly find that the plaintiff failed to adduce any credible evidence, circumstantial or otherwise, that Empire at any time had a dangerous probability of success in achieving a monopoly or in acquiring monopoly power in the retail sale or distribution of LP gas or of any other "part of the trade or commerce" in any relevant geographic market. Indeed, we find that the undisputed data in evidence tends to establish that during the relevant time period Empire's annual retail sales of LP gas have declined, both in terms of gallons sold and dollars received, in each of plaintiff's alleged market areas and that during the same time period Empire's "market share" has declined in each of the alleged market areas. Other LP gas companies experienced no difficulties in entering each of the alleged market areas and many of the new entrants experienced steadily increasing retail sales and profits. Particular established LP gas companies in each of the alleged thirteen market areas had increasing retail sales, profits, and "market shares."

We expressly find that the "survey" conducted by the plaintiff, which purported to utilize a questionnaire format, and which reflected plaintiff's election to ignore this Court's pretrial order of July 17, 1973, under which an approved survey procedure would have been established, did not demonstrate or even tend to demonstrate that Empire ever had a dangerous probability of success in achieving a monopoly or in acquiring monopoly power in the distribution or retail sale of LP gas.

12. In regard to paragraph 13a of plaintiff's amended complaint which alleged that Empire "acquired and attempted to acquire the assets or stock of a substantial number of LP gas distributor competitors and potential competitors of Empire," plaintiff did offer testimony and documents which established

that Empire did in fact enter into a number of agreements whereby it purchased certain assets or stock of various LP gas businesses. We find, however, that proof of the number of asset purchases, and proof that Empire grew in physical size did not, under the circumstances of this case, demonstrate or tend to demonstrate the effect or likely effect that such asset purchases may have had upon trade or commerce in any relevant geographic area.

13. Plaintiff also alleged in paragraph 13b of its amended complaint that Empire has "entered into and attempted to enter into agreements and understandings whereby Empire agreed with LP gas distributor competitors that they would not compete for or accept orders from each other's customers." We find that the evidence adduced in regard to the May 8, 1963 Propane Corporation agreement, which was apparently ancillary to the purchase of Super Propane Corporation by Warren Petroleum Corporation, is clearly insufficient to establish plaintiff's claim.

14. We find plaintiff also failed to adduce sufficient credible evidence to establish its allegations in paragraph 13c of its amended complaint that Empire has "entered into or attempted to enter into agreements and understandings whereby Empire and LP gas distributor competitors agreed not to sell in each other's marketing areas."

15. In regard to plaintiff's allegation in paragraph 13d of its amended complaint that Empire "sold and threatened to sell LP gas at prices which were below cost, or at prices which were substantially reduced or lower than prices charged by Empire in other areas, for the purpose of coercing and inducing LP gas distributors competing with Empire to (1) increase their LP gas prices, (2) stop soliciting the customers of Empire, and (3) sell out to, or cause or refrain from doing business in competition with, Empire," we find that plaintiff did not offer sufficient credible evidence to establish that Empire ever sold or threat-

ened to sell LP gas at or below its cost, or that Empire ever reduced its LP gas prices for the purpose so alleged. We expressly find that the three exhibits purportedly demonstrating "Below-Cost Pricing," in one of its thirteen alleged market areas [GX 172, GX 173 A–B, and GX 174], were not prepared in accordance with standard accounting practices and procedures, and that they have little or no probative value. We further find that the evidence adduced by plaintiff in regard to various instances where one or more of Empire's subsidiaries in fact reduced retail LP gas prices in particular areas established only the dates and amounts of such reductions, and was insufficient to carry the factual burden of proving the effect of the various price reductions upon trade or commerce, or the purpose or intent of Empire in making them. There is substantial evidence in the record, developed principally upon cross-examination of plaintiff's own witnesses, which tended to establish that many of the price reductions were made in response to competitive conditions, as they existed in a particular geographic area.

16. We find that plaintiff failed to carry the burden of proving that Empire "attempted to injure or destroy and threatened to injure or destroy the business or property of LP gas distributors where said distributors solicited customers of Empire or refused Empire's request that they raise their LP gas prices," as alleged in paragraph 13e of plaintiff's amended complaint.

17. We find that plaintiff failed to prove that Empire "entered into and attempted to enter into price fixing agreements with LP gas distributors to increase LP gas prices," as alleged in paragraph 13f of plaintiff's amended complaint. Indeed, the record is clear that witness after witness called by plaintiff testified that neither he nor his respective LP gas company had ever entered into any price fixing agreement with Empire or any of its directors, officers, employees, or agents.

18. Plaintiff did prove that Empire "entered into covenants not to compete with a substantial number of individuals, companies, and corporations who were actual or potential LP gas distributor competitors of Empire," as it alleged in paragraph 13g of the amended complaint. We find, however, that the evidence adduced in that regard was sufficient only to establish the number of such covenants and the terms of the various contracts. We find that plaintiff did not offer sufficient credible evidence to demonstrate or tend to demonstrate that the covenants, standing alone, constitute an unreasonable restraint of trade or commerce. We further find that the evidence adduced in regard to the covenants, when considered in light of all of the other evidence adduced by plaintiff, was insufficient to support plaintiff's claims.

19. We find in regard to plaintiff's allegation in paragraph 13h of its amended complaint that Empire "utilized purchases or potential purchases by Empire and its employees to coerce and attempt to coerce, induce or persuade certain of Empire's suppliers and potential suppliers of goods and services to stop buying LP gas from the other LP gas distributors and agree to buy their requirements of LP gas from Empire," that there is no credible evidence that Empire, or any of its directors, officers, employees or agents, ever coerced or attempted to coerce any of its suppliers or potential suppliers to agree to buy their LP gas from Empire. We further find that there is no evidence in this record to support a finding of any bilateral reciprocal agreement between Empire and any other entity or individual.

20. In regard to plaintiff's allegation that Empire "brought vexatious lawsuits against competitors as an exclusionary tactic," we find that plaintiff failed to carry the burden of proving that the lawsuits that Empire brought against various LP gas distributors or their owners, officers, or employees were in fact vexatious under the circumstances and that such lawsuits, individually or taken together, constituted a restraint of trade or commerce.

21. We find that plaintiff failed to prove that one of the effects of Empire's alleged illegal activities is that "competition between LP gas distributors in the sale of LP gas to consumers has been suppressed or eliminated," as alleged in paragraph 14b of the amended complaint. Plaintiff did not offer any credible evidence which even tended to establish that competition between any LP gas distributors has been suppressed or eliminated. The undisputed evidence in this case establishes that intense competition generally existed at all relevant times throughout the LP gas industry and, in particular, in each of plaintiff's thirteen alleged market areas. We so find.

22. We find that plaintiff failed to prove its allegation in paragraph 14c of its amended complaint that another effect of Empire's alleged illegal activities is that "LP gas distributors have been excluded from, or impeded, injured, obstructed and harassed in, the business of selling LP gas." We accept the testimony of plaintiff's own witnesses which conclusively established not only the number of new entrants into the thirteen alleged market areas, but also the ease with which various LP gas companies have profitably entered these alleged market areas.

### III. CONCLUSIONS OF LAW

1. This Court has jurisdiction over both the parties and the subject matter.

2. Plaintiff failed to carry the burden of proving that Empire has ever entered into any "contract, combination * * * or conspiracy in restraint of trade or commerce," in violation of Section 1 of the Sherman Act. Such proof is essential to establish a violation of Section 1 of the Sherman Act; unilateral action does not violate that section. See United States v. National Malleable & Steel Castings Co., 358 U.S.

38, 79 S.Ct. 39, 3 L.Ed.2d 44 (1958), Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 74 S. Ct. 257, 98 L.Ed. 273 (1954). Plaintiff must also prove that the parties possessed an intent to act in concert. See Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); and Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). We conclude that under the facts as we have found them, plaintiff failed to carry the burden of proof imposed on it by applicable law.

■ 3. Plaintiff failed to carry the burden of proving that Empire ever monopolized, attempted to monopolize, or combined or conspired to monopolize "any part of the trade or commerce," in violation of Section 2 of the Sherman Act, in that the weight of the credible evidence did not establish (a) the existence of any relevant geographic or product market; (b) that Empire at any time possessed a specific intent to achieve a monopoly or acquire monopoly power; or (c) that Empire at any time had a dangerous probability of success in achieving a monopoly or in acquiring monopoly power.

■ The relevant geographic market under Section 2 of the Sherman Act must be determined in terms of "the commercial realities of the market," and must be "economically significant." Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The primary test of an economically significant market area which corresponds to "commercial realities" is that "area in which the seller operates, and to which the purchaser can practicably turn for supplies." Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961); Brown Shoe Co. v. United States, 370 U.S. 294, 336 (1962); United States v. Philadelphia National Bank, 374 U.S. 321, 361, 83 S.Ct. 1715, 10 L.

Ed.2d 915 (1963); United States v. Phillipsburg Nat'l. Bank & Trust Co., 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). This test was recently reaffirmed by the Supreme Court in United States v. Marine Bancorporation, Inc., 418 U.S. 602, 94 S.Ct. 2856, 41 L. Ed.2d 978 (1974). Plaintiff's evidence did not establish the relevant geographic markets required under applicable law.

■ A relevant product market must also be proven, Agrashell, Inc. v. Hammons Products Co., 479 F.2d 269 (8th Cir.˙1973). The relevant product market must be determined in terms of "[M]arket alternatives that buyers may readily use for their purposes," United States v. E. I. duPont de Nemours & Co., 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). See also United States v. Continental Can Co., 378 U.S. 441, 84 S. Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. General Dynamics Corp., 341 F.Supp. 534 (N.D.Ill.1972), aff'd. 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 930 (1974). Plaintiff failed to prove that LP gas was in fact a relevant product market or submarket. Plaintiff attempted to base its required proof of relevant markets on a survey which, in turn, was based upon a questionnaire which it elected to use rather than comply with an express order of court. This Court, pursuant to its standard procedures and in accordance with the Manual for Complex Litigation, (§ 2.70 et seq.), established a procedure in Pretrial Order No. 1 (July 17, 1973) under which plaintiff was directed to prepare a survey questionnaire, submit that proposed questionnaire to the defendant and thereafter to the Court in order that all questions of adequacy and admissibility could be determined prior to its use. That procedure contemplated that the Court would issue a court-approved questionnaire to intended recipients under power of subpoena. For reasons never explained, plaintiff refused to comply with those directions and elected to mail an unapproved questionnaire, all of which substantially complicated plain-

tiff's ability to carry the burden of proof imposed on it by law.

In accordance with our standard practice in non-jury cases, we admitted plaintiff's survey in evidence subject to defendant's objections. When plaintiff's principal survey witness was examined for the purpose of establishing a proper foundation for admitting the survey into evidence, it became clearly apparent that the witness disclaimed any qualification as an economist [Tr. 80] and that his function in regard to the survey had in fact been no more than that of a "bookkeeper" [Tr. 1022]. The testimony of various witnesses revealed that the manner in which the data was gathered by plaintiff's unauthorized questionnaire did not insure either its accuracy or reliability. Even if it be assumed that a proper foundation for plaintiff's survey had been established, plaintiff's evidence falls far short of proving the essential element of "dangerous probability" required in every Section 2 action. Plaintiff's survey, when considered in light of all the other circumstances, established the entry of new competitors in each of the alleged market areas and the ease with which such entry was and could be made.

### IV.

The findings of fact and conclusions of law above stated adequately dispose of this litigation. We shall amplify those findings and conclusions in order that the rationale upon which our ultimate conclusion that plaintiff failed to carry the burden of proof imposed on it by law be clearly stated. We do so in the hope that what will be said will improve the administration and enforcement of the antitrust laws of the United States. It is apparent that many of our findings of fact are directly keyed to specific allegations of the plaintiff's amended complaint. We followed that pattern in order to state in this part of this opinion the reasons why the evidence adduced by the plaintiff was not sufficient to prove its case.

The first eleven paragraphs of our findings of fact need no elaboration or discussion of legal authority. We proceed therefore with the remaining paragraphs of our findings of fact:

■ Paragraph 12 of our findings of fact related to defendant's stock and asset acquisitions. Plaintiff introduced in evidence defendant's records which reflected defendant's stock and asset purchases over the years. That evidence, of course, shows that defendant has grown through such purchases. That evidence does not, however, prove any specific intent on defendant's part to monopolize any particular market by those acquisitions. Plaintiff adduced no evidence, for example, that defendant used any of the acquisitions to "underwrite the losses of local price-cutting campaigns," as was the case in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954). Proof that the defendant made a number of asset purchases, most of which were located outside of plaintiff's thirteen alleged market areas, simply does not constitute proof that defendant violated Section 2 of the Sherman Act.

■ Plaintiff's proof must be made in connection with a defined market area. Agrashell, Inc. v. Hammons Products Co., supra, and Acme Precision Products, Inc. v. American Alloys Corp., 484 F.2d 1237 (8th Cir. 1973). Purchases of assets located outside defendant's alleged market areas are clearly irrelevant. Neither size, United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920), nor mere number of acquisitions, standing alone, is proscribed by the Sherman Act. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), citing United States v. United States Steel Corp., supra. It is therefore apparent that proof of the number of defendant's acquisitions, absent a showing of their impact or effect on plaintiff's thirteen alleged market areas, is not sufficient to establish a Section 2 violation.

Paragraphs 13 and 14 of our findings of fact relate to plaintiff's effort to adduce sufficient evidence to sustain the allegations of plaintiff's amended complaint which claimed that the defendant allocated markets or customers with its competitors. Plaintiff did introduce in evidence (1) an agreement not to compete between Super Propane Corporation and Robert W. Plaster, entered into before defendant came into existence; (2) a territorial allocation between Plaster and Arthur Gas Company, again before defendant was incorporated; and (3) various transfers of customers from one of defendant's subsidiaries to another.

■ Assuming that the evidence would support a finding that defendant somehow became a party to the Super Propane and Arthur Gas Company agreements (an assumption that is difficult to make), the evidence is clear that neither agreement was ever enforced after defendant's incorporation. Unenforced agreements, even when proven, do not violate the Sherman Act. See American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131 (2d Cir. 1971); Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2d Cir. 1968), citing United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1965); United States v. Eaton Yale & Towne, Inc., 1972 Trade Cases, ¶ 73,889 (D.Conn.1972); Ansul Co. v. Uniroyal, Inc., 306 F.Supp. 541 (S.D.N.Y.1969). Quite contrary to plaintiff's claim, the evidence in this case established increased competition between defendant and Super Propane after defendant's incorporation, including massive solicitation of each other's customers. That evidence also established that defendant and Arthur Gas Company did not stay out of each other's sales areas. Plaintiff's evidence was obviously insufficient under the circumstances.

Paragraph 15 of our findings of fact related to plaintiff's claim that defendant had in fact engaged in predatory pricing practices within the rule of such

cases as Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); Moore v. Mead's Fine Bread Co., supra; National Dairy Products Corp. v. United States, 350 F.2d 321 (8th Cir. 1965); and Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa. 1968).

This Court has had experience in evaluating the manner in which predatory price evidence must be obtained before trial and adduced in evidence. For we sat as the trial judge in National Dairy Products. In sharp contrast with the evidence adduced in that case, plaintiff in this case simply failed to properly prepare whatever case it may have had before trial and was therefore not in a position to prove at trial that defendant's pricing was predatory at any particular time or any particular place. There was, of course, some evidence of infrequent price decreases within the thirteen alleged market areas. But plaintiff's own witnesses testified that defendant was responding to competitive forces which were in play on those occasions. It is clear that in particular areas defendant directed price decreases in an attempt to regain customers who had been lost to competitors who prior to that time had been selling at lower prices than had the defendant or one of its subsidiaries.

■ Evidence that a particular defendant did in fact engage in price cutting, or even in below-cost pricing, does not, standing alone, constitute proof of predatory pricing. Indeed, evidence of such activity could in fact be said, under the circumstances of a particular case, to be evidence of the existence of a highly competitive market. See Cooper, "Attempts and Monopolization: A Mildly Expansionary Answer to the Riddle of Section Two," 72 Mich.L.Rev. 374, 437 (1974).

The point of the whole matter is that plaintiff, in a quite haphazard manner, adduced some evidence concerning defendant's pricing in a few isolated in-

stances, but did not even attempt to adduce any additional and supplemental evidence upon which a finding of predatory pricing could be properly based.

Paragraphs 16, 21 and 22 of our findings of fact relate to plaintiff's failure to carry the burden of proof that defendant attempted to or threatened to injure or destroy the business or property of its competitors and the effect which the alleged threats allegedly had on those competitors.

The general quantum and weight of plaintiff's "evidence" to prove its expansive claims in this regard is best illustrated by reference to plaintiff's apparently serious effort to incorporate virtually the entire transcript of the trial of United States v. Empire Gas Corp., et al. Criminal No. 23917–1, into the record in this case as a basis upon which plaintiff could predicate findings of fact in this case. Defendant, of course, was acquitted in the trial of the criminal case. It must also be remembered that plaintiff, after that acquittal, dismissed Count I of the criminal indictment which alleged a violation of Section 2 of the Sherman Act.

An example of plaintiff's attempted use of the transcript of the record of the criminal trial is illustrated by its proposed finding of fact No. 97f, which suggests that this Court should find as a fact that "Harold Smith, acting as an agent of defendant, in February, 1969, procured Alfred Earl Harflinger and James William Nash to destroy a newly purchased LP gas bulk delivery truck owned by Leslie Heriford in Ava, Missouri . . . ."

Plaintiff has also sought to base similar proposed findings of fact on testimony given by particular persons who testified before one of the three separate grand juries involved in this case and the testimony of other persons whose depositions were taken before trial. In regard to the criminal trial testimony, plaintiff long before trial conceded that it "cannot seriously argue that the wit-

nesses whose testimony from the criminal trial is desired for the civil trial are unavailable." (See page 30 of plaintiff's Memorandum filed March 16, 1972).

In spite of procedures established in an early stage of the actual trial in regard to whether deposition testimony would be admitted (see Tr. 361–376), plaintiff did not attempt to make any appropriate showing in regard to the lack of availability of any of the particular witnesses whose deposition or grand jury testimony plaintiff wished to have admitted in evidence. And plaintiff elected to pursue that course of action in the face of its nationwide subpoena power.

We believe it clear under the authorities to which we directed plaintiff's attention at an earlier stage of the trial, (Tr. 365–368) that the deposition testimony may not properly be considered because of plaintiff's failure even to attempt to make the showing required by Rule 32(a)(2), (3). We are also of the opinion that application of similar principles would probably require exclusion of the grand jury and criminal trial testimony.

Consistent, however, with our view that cases should be decided on the merits rather than on procedural grounds, we have read and considered all of the criminal trial, deposition, and grand jury testimony upon which plaintiff attempts to rely to support its various proposed findings of fact as though such testimony was not subject to any objection. That consideration sustains Judge Learned Hand's oft-quoted observation in Napier v. Bossard, (2nd Cir. 1939) 102 F.2d 467 at 469, that "the deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand."

The grand jury testimony. salted as it was with leading and suggestive questions, and even containing highly questionable admonitions to various of the witnesses, was even more unsatisfactory.

The burden of proving its case by a preponderance of the credible evidence rests upon the plaintiff. We are not satisfied that plaintiff carried any of that burden by directing our attention to isolated portions of transcribed testimony given by witnesses who testified in a criminal trial involving issues different from the issues presented in this case, or to testimony by way of pretrial deposition, or to testimony given before one of the three grand juries empanelled by the government in this case.

Much of the testimony was not subject to any cross-examination; some of it was obviously based upon hearsay and rumor. We find and conclude that even if the criminal trial testimony, the deposition testimony and the grand jury testimony is considered as free from objection, such testimony, when considered in light of all the other testimony and evidence in the case was not of sufficient weight to warrant a finding that plaintiff had successfully carried the burden of proof in regard to the allegations of the amended complaint. We add that we have in the same manner considered the testimony which defendant contends is incompetent under the Missouri Dead Man's Act and have reached the same conclusion in regard to that testimony. It is our express finding and conclusion that even if it is assumed that all of the questioned testimony were admissible in evidence, it is simply insufficient to persuade the finder of facts that plaintiff has sustained the burden of proving its case.

Paragraph 17 of our findings of fact reflects our view of the evidence adduced by plaintiff to support its price-fixing claim. Plaintiff did introduce some evidence that prices were discussed by various of defendant's employees with various employees or owners of other LP gas companies. But proof of those conversations did not prove the existence of price-fixing agreements. The record reasonably establishes that none of defendant's employees who talked about prices had any real or apparent authority in regard to setting the retail prices at which any of defendant's subsidiaries sold LP gas. There simply was no evidence in this case that defendant in any way deviated from the procedures established in its Operational Policy Manual (Pl.Coll.Ex. 7, p. 11) which stated at age 73 that: "The retail prices and retail pricing policies are the direct and absolute responsibility of the Director of Retail pricing, located in the home office * * *. All price changes or deviations must be approved by the Director in advance."

Paragraphs 18 and 20 relate to defendant's covenants not to compete and the lawsuits brought to enforce those covenants. Covenants not to compete have a long juridical history. There are, of course, cases in which a particular court, in its discussion of all the facts and circumstances involved in a particular antitrust case, has taken note of the fact that a particular defendant did in fact have an established practice in regard to covenants not to compete. But we know of no case which even intimates that inclusion of such a covenant in a defendant's employment contracts, standing alone, constitutes a violation of the antitrust laws.

Plaintiff's evidence can be said to establish that the defendant did in fact have a large number of employee contracts which did in fact contain covenants not to compete. But that evidence falls far short of establishing that the contracts were unreasonable restraints of trade or that they constituted a violation of an antitrust law. See Blake, "Employee Agreements Not To Compete," 73 Harv.L.Rev. 625 (1960), and cases discussed therein.

Plaintiff's evidence in regard to the covenants not to compete as contained in some of defendant's acquisition contracts was similarly deficient. It has long been settled that covenants not to compete which are ancillary to the sale of business assets do not violate antitrust laws so long as they are no broader than necessary regarding time, terri-

tory, and product line. See United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898) and Goldberg v. Tri-States Theatre Corp., 126 F.2d 26 (8th Cir. 1942). Courts have generally permitted even wider latitude in the scope of non-competition agreements ancillary to the sale of a business or business assets than to such covenants in employment agreements. Mouldings, Inc. v. Potter, 315 F.Supp. 704 (M.D. Ga.1970); Day Companies v. Patat, 403 F.2d 792 (5th Cir. 1968) and Von Kalinowski, Antitrust and Trade Regulations, § 1.03[4][i].

Plaintiff, in effect, asks this Court to find a "plan or scheme" by defendant to monopolize the LP gas industry from the mere existence and number of covenants not to compete procured by defendant from its employees or ancillary to its asset purchases. The general language relied upon by plaintiff as contained in United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); Schine Chain Theatres, Inc. v. United States, *supra*; and Marnell v. United Parcel Serv. of America, Inc., 1971 Trade Cases, ¶ 73,761 (N. D.Cal.1971) does not support plaintiff's proposed findings or proposed conclusions of law. *American Tobacco* stands only for the proposition that covenants not to compete may be a device used to extend a pre-existing monopoly. *Schine Chain Theatres* also involved only the extension of a pre-existing monopoly. *Marnell,* like *Schine* and *American Tobacco,* stands only for the proposition that covenants not to compete can be a factor in inferring an intent to extend a pre-existing monopoly. This Court cannot properly infer a plan to monopolize solely from defendant's total number of covenants not to compete and that is about all plaintiff's evidence amounted to.

■ Plaintiff did, of course, introduce some evidence that defendant has engaged in litigation with various "competitors" and former employees, primarily over covenants not to compete in pur-

chase and employment agreements. Those lawsuits, however, were based upon written contracts which were not *per se* illegal and unenforceable. United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), together with the more recent cases of California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) and Otter Tail Power Company v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), all require a factual finding that litigation against competitors must be a "mere sham" before such litigation may be found to be violative of the antitrust laws.

Application of the standards articulated in *Noerr, Pennington, Trucking Unlimited,* and *Otter Tail Power Company* and those stated in analogous cases involving the enforcement of fraudulently procured patents, see, e. g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 84 S.Ct. 347, 15 L.Ed.2d 247 (1965), and its progeny, require and support our findings in regard to the covenants not to compete and our finding that plaintiff failed to show that defendant in fact engaged in "vexatious" or "sham" litigation in regard thereto.

■ Paragraph 19 of our findings related to plaintiff's failure to prove that defendant had in fact engaged in unlawful reciprocal purchasing agreements. Plaintiff's effort to prove that defendant had an illegal reciprocal purchasing policy was based primarily on defendant's use of the term "reciprocal sales" in its Operating Policy Manual (Pl. Coll. Ex. 7, p. 11). The testimony of the single witness called to testify on this subject is not relied upon in support of any of plaintiff's proposed findings or proposed conclusions. We need simply state that nothing said in the leading cases of FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220,

14 L.Ed.2d 95 (1965), and United States v. General Dynamics Corp., 258 F.Supp. 36 (S.D.N.Y.1966) support plaintiff's contention in regard to its reciprocal purchasing claim. In *General Dynamics*, for example, the trial court made it clear that "bilateral arrangements" or agreements were necessary for reciprocal purchasing to violate Section 1 of the Sherman Act.

It is therefore apparent that evidence that the defendant may have made purchases from its customers, without more, does not constitute proof of a violation of the Sherman Act. Plaintiff is required to show: (1) that a *quid pro quo* was demanded or understood to be an integral part of the reciprocal purchases, see, e. g., Stavrides v. Mellon National Bank & Trust Co., 353 F.Supp. 1072 (W.D.Pa.1973); and (2) that a "not insubstantial" amount of trade in a line of commerce was restrained. See, e. g., International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20 (1947); United States v. General Dynamics Corporation, 258 F.Supp. 36 (S.D.N.Y.1966). At a bare minimum there must be some form of understanding between seller and buyer to reciprocate. A bilateral understanding is the *sine qua non* of Section 1 of the Sherman Act. It is clear that plaintiff did not even attempt to offer evidence sufficient to prove the allegation of its amended complaint in regard to reciprocal purchasing and that this Court could not make any other finding than that made in paragraph 19 of our findings of fact.

Application of the principles of law stated in our conclusions of law to the facts as we have found them, as both have been amplified in part IV of this memorandum opinion, requires that final judgment be entered for the defendant. Accordingly, it is

Ordered that the Clerk enter an appropriate final judgment in favor of the defendant, together with its costs.