**In the Matter of TRANSCONTINENTAL ENERGY CORPORATION, a Nevada Corporation, f/k/a Oil Producers & Refiners, Inc., f/k/a Transcontinental Power Company, Bankrupt.**

**Bankruptcy No. BK-LV 77-730.**

United States Bankruptcy Court, D. Nevada.

Dec. 13, 1979.

Roger Wesley, of Cotten, Day & Doyle, Washington, D. C., for applicants, Owen E. Jackson, et al., and Scholefield, Bellanca & Co.

Ronald Gene Self, Arvin, Cal., for applicants, George L. Naron, Riley Barnes, Riley K. Barnes, III, Rodger Barnes, Dr. S. H. Montgomery, Dusty Rhodes, and Wesley J. Reimer.

Joseph L. Golden, of O'Melveny & Myers, Los Angeles, Cal., and William L. McGimsey, of Albright, McGimsey & Stoddard, Las Vegas, Nev., for purchaser, Pacific Energy Resources.

Robert Clive Jones, of Jones & Holt, Las Vegas, Nev., for Trustee, Robert N. Broadbent.

Peter N. Reynolds, of Johnson, Pilkington & Reynolds, Las Vegas, Nev., for the Bankrupt, Transcontinental Energy Corp.

Patrick C. Clary, of Perry & Clary, Las Vegas, Nev., and James H. Mitchell, Jr., of Mitchell & Pierce, Los Angeles, Cal., for various creditors of the Bankrupt.

## MEMORANDUM OPINION

LLOYD D. GEORGE, Chief Judge.

On December 28, 1978, following numerous continuances in favor of potential opposing bidders, this Court approved the public sale of certain limited partnership interests of the Bankrupt to an entity known as Pacific Energy Resources. These four limited partnerships hold varying leasehold rights in oil-producing properties in the state of California. Mr. Roger C. Wesley, Esq., counsel for several claimants in the above-entitled proceeding and Mr. Ronald G. Self, Esq., representing a number of minority shareholders in the Bankrupt, now seek to have this sale set aside on the basis of alleged irregularities in the Trustee's handling of the sale, including his general "mislement" [1] by the buyer and the Bankrupt's president. Pursuant to this Application, a full evidentiary hearing was held in May, 1979, followed by the filing of points and authorities and oral argument on behalf of all of the interested parties. Thereafter, the Court was petitioned on two separate occasions to reopen the above hearing to receive further evidence on behalf of the applicants. Further, a motion has been made for the Court to reconsider its exclusion of a deposition introduced at the hearing. Upon its review of the taped record of the sale and of relevant legal authorities, the Court declines to hear the belated evidence now proffered, or to alter its exclusionary ruling, and finds that the sale was properly conducted under the United States Bankruptcy Act and the rules of law and equity attendant thereto. The sale will not be set aside.

In making this determination, the Court notes as its starting point the widely-respected proposition that the need for stability in judicial sales will normally preclude their being set aside, except where a clear

1. *See* Application for Order Setting Aside the Sale of Certain Partnership Interests of the Debtor to Pacific Energy Resources, at 15. The Court has been at a loss to find a proper definition for this apparent word of "art." It is supposed that it relates to the process by which the Trustee was allegedly misled (i. e., "mizzled"). Perhaps a recourse to the literary works of Richard B. Sheridan would reveal its mysterious verbal etiology.

and convincing showing of fraud, unfairness, misrepresentation, or unjust imposition in the execution of the sale creates an equitable imperative which would justify a revocation of judicial sanction. *Proctor & Gamble Mfg. Co. v. Metcalf,* 173 F.2d 207, 209 (9th Cir. 1949); *In re Marathon Foundry & Mach. Co.,* 239 F.2d 122 (7th Cir. 1955), *cert. denied sub nom. Dyner v. Schwartz,* 353 U.S. 912, 77 S.Ct. 669, 1 L.Ed.2d 665 (1957). *Cf.* 4B Collier on Bankruptcy ¶ 70.-98[17], at 1180–94 (14th ed. 1975) (distinguishing the reasons for denying the confirmation of a sale and the grounds for setting aside such a sale after confirmation). Inadequacy of a confirmed sale price will not, of itself, be grounds for setting aside that sale. Rather, such an insufficiency must either be openly accompanied by evidence of fraud or unfairness, or be "so great as in itself to raise a presumption of fraud or to shock the conscience of the court." *In re Burr Mfg. & Supply Co.,* 217 F. 16, 21 (2d Cir. 1914). *See also Smith v. Juhan,* 311 F.2d 670 (10th Cir. 1962); *Dyar v. Stewart,* 123 F.2d 278 (5th Cir. 1941). *Cf. Turner v. Dewco Services, Inc.,* 87 Nev. 14, 479 P.2d 462 (1971); *Brunzell v. Woodbury,* 85 Nev. 29, 449 P.2d 158 (1969); *Golden v. Tomiyasu,* 79 Nev. 503, 387 P.2d 989 (1963) (even a gross inadequacy of price is not sufficient to set aside a sale under a deed of trust, unless it is accompanied by proof of fraud, unfairness, or oppression).

Pursuant to their obligation of proof, the Applicants have evoked a tantalizing scenario of deceitful collusion between Pacific Energy Resources and Edward Dewey, the President of Transcontinental Energy Corporation. Mr. Richard Young, the moving force within the Pacific Energy organization, has been associated with Mr. Dewey, as a stockholder of the Bankrupt, for some period of time. Messrs. Dewey and Young have, at times, been on the same and opposing sides of the multiple shareholder disputes which have brought Transcontinental Energy Corporation into these proceedings. About one year prior to the sale now in question, Mr. Dewey employed Mr. Young to manage the operations of the Harrison Oil Well, one of the properties subject to the sale now in question. This employment was without this Court's authorization, though no evidence exists that the hiring was motivated by anything other than the operating needs of Transcontinental Energy Corporation, then a Debtor under Chapter XI of the Bankruptcy Act. Nevertheless, it is the contention of the Applicants that through this employment Mr. Young was able to garner information which gave him a superior bargaining position over the other prospective bidders with respect to at least the Harrison limited partnership interest. Additionally, it is maintained that, following their earlier reconciliations, Mr. Dewey used his influence on behalf of Mr. Young to discourage other possible buyers from entering the bidding contest sponsored by the Trustee. In return for this and other favors, Mr. Young is said to have invested, with his wife, in one of Mr. Dewey's other business ventures. By this conspiracy, the Applicants assert, Mr. Young was rendered the only bidder capable of intelligently setting a price not in excess of the open market value of the various interests. Other potential bidders were thus allegedly left in the unenviable position of making blind offers without the insight of Mr. Young or the cooperation of Mr. Dewey.

Throughout this affair, the Applicants claim that the Trustee was kept from a knowledge of the true value of the partnership interests by the connivance of the above principals. Therefore, at the time of this Court's sale, the Trustee could not dispute the fairness of Mr. Young's bid, even though it was set at only a third of the value of the property as appraised by witnesses for the applicants. Hence, the latter claimants contend that because of this chicanery, the ignorance of the Trustee, and an "overabundance [sic] of impatience" on the part of this Court, Mr. Young and his associates will be able to obtain an unfair windfall at the expense of the Bankrupt's estate and its creditors, unless this sale is now declared void.

If a Pygmalionic wish alone could render truth of Counsel's pleadings, this Court

would not hesitate in the least to exercise its equitable powers to nullify the Trustee's sale. This hideous Galatea has found no life, however, despite the lengthy invocations of its creators. Unsubstantiated hypotheses and groundless innuendoes, no matter how sinister their appearance, are not adequate substitutes for the sort of clear and convincing exhibition of fact required to set aside a confirmed sale by a trustee in bankruptcy.

In the case at bar, for example, the Applicants have only shown the existence of an opportunity for the sort of collusion charged. Nowhere can this Court find substantial proof, however, that Mr. Young capitalized upon this opportunity to the detriment of the Bankrupt's estate or in any unlawful or unfair way.

In this regard, the evidence adduced at hearing does not show, in any conclusive fashion, that Mr. Young ever purposefully made misrepresentations as to his relationship or intentions with respect to the Bankrupt, the subject properties, or the limited partnership interests sought by Pacific Energy Resources. Moreover, the few misstatements which are rightfully attributed to him do not appear to have, in any way, lowered the bids made by his competitors. If anything, for example, the bidding only became more serious after his mention of claimed royalty interests in the Harrison Well.

Also, the Court finds no proof whatsoever that Mr. Young knowingly falsified production figures on the Harrison Well while acting as its manager or even that he had possession of information not immediately made public through his periodic reports. The reporting errors cited by the Applicants throughout their investigation were shown at hearing to have represented little more than the usual type of clerical mistakes common in the oil industry and elsewhere. None of these appears to have been the result of a conscious attempt by Mr. Young to denigrate the production capacities of the Harrison site. In a similar vein, testimony elicited by both sides demonstrated clearly that Mr. Young's management did not result in any lessening of the Harrison Well's public sale value, but, if anything, raised that value prior to the time of the present sale. Monthly production figures for the Harrison Well appear to have more than doubled following the assumption of management duties by Mr. Young.

Perhaps the weakest portion of the Applicants' presentation is with respect to their claim of an actual understanding between Richard Young and Edward Dewey to prevent other potential buyers from gaining information about the limited partnerships and from making acceptable bids on those interests. That these men had a longstanding association cannot be doubted. Still, that association has apparently not always been a pleasant one. Although the Applicants have uncovered one isolated business venture between Messrs. Dewey and Young during the time frame now involved, the evidence is quite clear that these men dealt on a strictly arm's-length basis in that transaction and that it occurred independent of their interactions in the sale of the Bankrupt's property. There has been no showing of a conspiracy between these gentlemen which would link their interests to the point of proving misconduct with respect to the Trustee's sale.

On this issue, the Applicants have attempted to introduce three items of evidence, two somewhat belatedly, which the Court has excluded from its determination of the propriety of this sale. The first, a deposition given by one Ernest Dolley, was rejected at hearing because of the Court's concerns with fairness to counsel for Pacific Energy Resources, who had not been informed that Mr. Dolley could not be present for examination. Following the hearing, but prior to oral argument, the Applicants moved for a reconsideration of this exclusion, citing F.R.Civ.P. Rule 32(a)(3)(B) in support of an absolute admissibility standard on depositions where the deponent is located more than 100 miles from the place of hearing. Assuming the applicability of this rule to non-adversary proceedings in bankruptcy under Bankruptcy Rule 914, the Court can still make no finding that Mr.

Dolley was, in fact, located at a distance of greater than 100 miles from the scant evidence in its possession and from that offered at trial. The burden of establishing this distance is, of course, on the parties offering the deposition, *U. S. v. Empire Gas Co.*, 393 F.Supp. 903 (W.D.Mo.1975), *aff'd*, 537 F.2d 296 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Grisom v. Logan*, 334 F.Supp. 273 (D.Cal.1971). Counsel for the Applicants, however, try to place this obligation upon Pacific Energy Resources following their own weak effort at showing isolated business activities on Mr. Dolley's part in the Los Angeles, California area. The Court would need a better showing than this to grant operative effect to the provisions of F.R.Civ.P. Rule 32(a)(3)(B) in the present case.

The second item of evidence proffered, again after the hearing but before oral argument, consists of a letter, dated April 16, 1978, from one Noeth B. Gillette to Edward Dewey, allegedly offering to purchase three oil leases, owned or partly owned by the Bankrupt, including two of the leases now in question, the Harrison and the Lawson-Bennett, for $200,000. A total price of $100 is also offered in the letter for the two other leases sold by the Trustee. The letter is offered in rebuttal to testimony given by Messrs. Gillette, Young, and Dewey concerning the extent of their business interactions prior to the Trustee's sale. Moreover, the Court supposes that the letter might establish another valuation standard to be used in judging the sufficiency of the sales price paid by Pacific Energy Resources. As to the latter question, the Court finds this letter to be of little practical value. Even if its foundation were to be properly laid, it would still not relate to the same interest package sold by the Trustee, with the same terms which the Trustee required at his sale. As for its materiality as an impeachment device, the Court can only comment that its mind would not be altered by the evidence. Only a mind already convinced of conspiracy would find such within the four corners of this missive. And, finally, the Court is not impressed from the affidavit of Mr. Barnes attached to this proposed exhibit that it could not have been found with proper diligence prior to trial.

As the last fruit of their post-trial discovery process, the Applicants present an August 27, 1979 affidavit of one Jack P. Stewart paraphrasing a conversation he claims to have had with Edward Dewey concerning the possible purchase of oil-producing properties from the Bankrupt. In that discussion, Mr. Dewey is said to have told Mr. Stewart that a bid on the Bankrupt's property for some $750,000 had already been lodged with the Bankruptcy Court and that any other bid on those assets would have to exceed that amount to be considered by the Trustee. At this late juncture, the Court is exceedingly reluctant to permit further evidence to be rendered on behalf of either side. *See Locklin v. Switzer Bros., Inc.*, 299 F.2d 160 (9th Cir. 1961), *cert. denied*, 369 U.S. 861, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962). Part of the security which a buyer should expect from a judicial sale is the assurance that any proceeding to question the validity of such sales will be handled with as much expedience as is possible and just. Unless the Court were to begin with the premise that a conspiracy has in fact taken place, Mr. Stewart's affidavit adds no new source of substantial evidence to be used in judging the fairness of this sale. Nothing in the affidavit relates directly to either Mr. Young or the buying entity formed by him. Only by drawing the same unwarranted inferences from Mr. Dewey's alleged reluctance to deal with Mr. Stewart as do the applicants can the Court find the collusion sought to be proven by this evidence. Although it is not properly cumulative in nature, in that it does raise a factual nuance not covered at trial, the Stewart affidavit is not so material as to require a reopening of the Applicants' case to permit its inclusion. *See Chromalloy American Corp. v. Alloy Surfaces Co.*, 55 F.R.D. 406 (D.Del.1972).

Concerning the price received by the Trustee for the Bankrupt's partnership in-

terests, the evidence demonstrates no gross inadequacy, such as would raise a presumption of fraud or unfairness. Rather, the price received reflects a number of important factors beyond the intrinsic value of the oil-producing properties themselves, which the Applicants have not considered in making their estimate of a fair sales price of the Bankrupt's interests in those properties. From the earliest date at which this sale was contemplated, the Trustee has represented to this Court that it was his belief that the Bankrupt's partnership interests should be sold without any prior legal examination into the quality and extent of those interests. It was feared that the litigational expenses arising from any such inquiry would more than offset the pecuniary advantage to be gained to the estate by being able to give bidders a more accurate picture of what they would be purchasing.

Therefore, even though the Court had before it the appraisal of the Applicant, Owen E. Jackson, that the Harrison partnership interest alone was worth, conservatively, $150,000, Mr. Jackson also candidly admitted that he would not have been willing to bid anything on this interest because of the chaotic conditions surrounding its creation. The Court cannot help but think that such reasoning would have affected the bid of any intelligent prospective buyer. No matter what the theoretical worth of these interests might be, the Court may only consider salable value in determining the sufficiency of a bid at a trustee's sale.

With this in mind, the Court feels that the estimate of Mr. Raymond H. Greutert, the appraiser selected by the Trustee in anticipation of this sale, was reasonably based and thus accurate to the point of establishing a crude figure from which the Court might judge the final amount paid by Pacific Energy Resources. Mr. Greutert's appraisal valued the entire "package" of interests sold at $127,600, less than the amount actually received by the Trustee.[2] The only other appraisal given, that of the Applicant, Riley K. Barnes, smacks of the same sort of creditor's optimism which infected Mr. Jackson's estimate. The Court finds the sales price not to have been unreasonable for the bundle of questionable rights sold from the Bankrupt's estate. In this same regard, the Trustee has purposefully avoided excessive advertising expenses which might bring no higher price for these interests because of their undefined nature. Although the Applicants may have desired a more extensive announcement of this sale, they have not shown that the Trustee was errant in his actions. Beyond the basic notice requirements of the Bankruptcy Act, 11 U.S.C. § 94a (1976), advertisement of a judicial sale is a discretionary matter on the part of the Trustee, whose pragmatic over-administrative economy may never be fully appreciated by dividend-minded creditors. *See In re Trustees & Y. M. C. A. of Atlantic City*, 10 C.B.C. 451, 462–65 (D.N.J.1976, Lipkin, B. J.). This Court finds the Trustee's attempts to engage responsible bidders on the subject partnership interests to have been appropriate in light of the totality of the circumstances surrounding that sale.

As a final aspect of the valuation question here raised, the Court is reluctant to concern itself with the many legal issues relating to the M & M Partnership dealings with the Harrison partnership. The Trustee sold the Bankrupt's interests in the Harrison with no promises of validity attaching to the historical creation or past transferrals of these interests. Those making bids on the various interests may or may not have found Mr. Young's previously-acquired claims in the partnership here involved to have been an obstacle to their acquisition

2. Although counsel for the Applicants have questioned the methodology used by Mr. Greutert in arriving at this figure, his qualifications as an appraiser of such properties are above reproach. Moreover, his position as an impartial professional, hired solely to perform this evaluation, lends credence to his estimate, as compared with the appraisals made by the Applicants, Owen E. Jackson and Riley K. Barnes. Further, the Court notes that the appraisal of Mr. Greutert was supported at the time of the sale by a number of leading creditors in this proceeding, who understood that a sale at this price would mitigate litigational costs arising from any attempt to sell these interests free and clear of conflicting claims or liens.

plans. Still, as the Court has maintained on various occasions, Mr. Young's actions were only those of an entrepreneur trying to take advantage of a business opportunity in a manner allowed by law. Others had a similar chance to use this sale to achieve their own financial ends. They could have ascertained the legal degree of Mr. Young's involvement as well as could Mr. Young, himself, relying on the same authorities which counsel now present. And, they could have locked Mr. Young into the same sort of possible loss situation envisioned by the Applicants by exceeding his bid on the Bankrupt's interests and forcing him to pay a premium on those interests or lose the value of his prior limited partnership purchases. That only one other interest found such a bidding contest attractive is more indicative of the confused state of affairs in which these interests were found at the time of the Trustee's sale than of any insidious effort on the part of Mr. Young or Mr. Dewey to force a favorable sale to Pacific Energy Resources.[3]

Such confusion, the Court notes, was not engendered by Mr. Young, Mr. Dewey, or any other single person or group of persons associated with the Bankrupt. For some time prior to entering these proceedings, the entire management structure of Transcontinental Energy Corporation was geared toward pursuing an obfuscatory course in its business dealings. In order to gain believed tax advantages, and for a multitude of other, less well-defined or -intentioned motives, the profitable running of an oil-producing business took a second position to the creation and acquisition of limited partnership interests. Shortly upon his appointment, the Trustee was required to decide whether to endeavor to untie this Gordian knot or to dispose of it in one simple stroke. Once again, the Court does not fault the Trustee for seeking to save litigational expenses in following the latter course. It is only unfortunate that the Trustee's frugality has not resulted in the economies expected because of the present misunderstanding with those same erstwhile creditors that he sought to benefit.

Based upon each of the above findings or conclusions, the Court can ascertain no conduct on the part of the buyer, the Trustee, or any other participant in this sale which would warrant a setting aside of this court-supervised transaction. Thus, only one additional legal issue remains which might void the confirmation of the sale. The Applicants have correctly noted that a fiduciary of a court in bankruptcy cannot bid on property sold from an estate wherein he holds said position of trust. *See Donovan & Schuenke v. Sampsell*, 226 F.2d 804 (9th Cir. 1955); *In re Frazin & Oppenheim*, 181 F. 307 (2d Cir. 1910). They have then argued that Mr. Young's employment as a pumper at the Harrison Well site would make him such a fiduciary of the Court and would thus automatically void any sale to him of the property of the Bankrupt's estate. This Court, however, by refusing to authorize the employment of Mr. Young by the Bankrupt, has already denied the existence of any fiduciary relationship between it and the purchaser herein. And, even if Mr. Young's actions had been under Court approval, it is doubtful that such activities are of the type which would establish a fiduciary link with the Court, as well as with the Bankrupt. *See generally* 4B Collier on Bankruptcy ¶ 70.98[15], at 1169–73 (14th ed. 1975). The scope of Mr. Young's employment was certainly not such as then required his constant return to the Court to report and to receive permission to perform further acts. Not every servant of the Bankrupt must swear his fealty to the court sitting in supervision of his master, even where that master has, itself, made promises of fiduciary loyalty. Moreover, by the time of this sale, even the Bankrupt had broken its bonds with the Court in deference to the Court's appointed Trustee. *Cf. In re Frazin*

3. The Court also notes that the other set of bidders who appeared at the Trustee's sale, Steve Riva and Andreas Thomopoulous, were entirely unwilling to purchase the Harrison interest at their proposed price of $130,000, without guarantees as to its validity. This introduced a condition which neither the Trustee nor even Mr. Jackson was willing to accept.

*& Oppenheim, supra* at 311 (dicta discussing whether an ex-officer of a court may bid at a court-supervised sale). The *Donovan* and *Frazin* rulings are inapposite to the facts of the case at bar. They will not void the sale to Pacific Energy Resources.